

**FILED** PK

6/1/2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JASON SHORE AND COINABUL | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2016-cv-04363 |
| v. | ) | |
| | ) | |
| | ) | |
| JOHNSON & BELL | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE TO PLAINTIFFS' MOTION TO UNSEAL CASE

Defendant JOHNSON & BELL LTD., by and through its attorneys, WILLIAMS MONTGOMERY & JOHN LTD., hereby responds to "Plaintiffs' Motion to Unseal Case" and states as follows:

## INTRODUCTION

This is a putative class action brought by former clients of the defendant law firm, Johnson & Bell, Ltd. ("Johnson & Bell") (Complaint attached as Exhibit A). Plaintiffs filed this suit under seal, promoted it in the press, received a Rule 11 warning for false allegations and, before an answer is even filed, dismissed the case in favor of arbitration. Even though the Court will never consider or rule on the merits or lack of merits in this case, Plaintiffs nevertheless want to unseal their complaint. For the numerous separate but equally compelling reasons discussed below the motion should be denied.

## BACKGROUND

Johnson & Bell previously represented and defended plaintiffs Jason Shore and Coinabul in a class action initiated by the same attorneys that initiated this action, the Edelson firm and Jay Edelson ("Edelson"), captioned *Hussein v. Coinabul, LLC, et al.,* No. 1:14-cv-05735 (N.D. Ill.)

1

("*Hussein*"). In connection with that representation, Johnson & Bell and Plaintiffs entered into an engagement letter containing an arbitration provision. Johnson & Bell subsequently withdrew its representation pursuant to court order and eventually a default judgment was entered in favor of Edelson's client and against Jason Shore and Coinabul on July 6, 2015 (Docket attached as Exhibit B). Now, only months after being adverse to Jason Shore and Coinabul in the *Hussein* matter, Edelson is representing Jason Shore and Coinabul in this matter and makes the claim that Plaintiffs' "Confidential Client Information" was "exposed" and "vulnerable" to disclosure.

Plaintiffs claim that Johnson & Bell's computer systems contained three so-called "vulnerabilities" that could potentially provide a path for an outsider to access the systems. (Ex. A. ¶ 18-33). Plaintiffs do not allege any actual intrusion into Johnson & Bell's computer systems or compromise of client confidential information. Instead, their claims are based solely on the potentiality of an intrusion and so-called "vulnerabilities" and "exposures."[1] (*Id.*).

Edelson filed the present suit under seal and also moved and received an order to temporarily seal the case. (Plaintiffs' Motion to Temporarily Seal attached as Exhibit C). In its motion to seal, Edelson argued, among other things, "Here there is more than simple good cause for sealing the case – Plaintiffs and the putative Class are in fact at risk of suffering serious harm if the Court does not grant this motion." (Ex. C at 3). The alleged risk of serious harm that warranted sealing the case in the first place was that Plaintiffs' and the Class' confidential information could be disclosed if the so-called "vulnerabilities" were made public.

---

[1] Plaintiffs claim the firm allowed internet access to its time and billing system and that system was using an "outdated JBoss Application Server." (Ex. A. ¶ 18-33). It is Johnson & Bell's position that at the time of the filing of this suit Johnson & Bell was not using a JBoss Application Server for internet access to its time and billing system. In this respect, Johnson & Bell has sought the basis for Plaintiffs' unfounded allegation, and none has been provided. It has also informed Plaintiffs pursuant to FRCP Rule 11 of the false and baseless allegation. (May 9, 2016 Bruck correspondence attached as Exhibit D). To date, the false and baseless allegation has not been withdrawn. Instead, Plaintiffs and their counsel seek to unseal the case and to make the false and baseless allegation public.

Despite the case being under seal, Plaintiffs' counsel, Edelson, has promoted this very action in the press both before and after the case was filed. *See* Aebra Coe, *BigLaw In Crosshairs As Firm Plans Data Breach Litigation*, Law360 (March 31, 2016) (attached as Exhibit E). And, after filing, Edelson made statements on Twitter and in the press regarding the present motion to unseal. *See* Allison Grande, *Edelson Targets Chicago Law Firm Over Lax Data Security*, Law360 (May 5, 2016) ("[Edleson PC] revealed in late March that it was gearing up to bring malpractice class actions against legal industry players over the exposure of client information . . . . The firm publicly followed up on the promise Thursday, confirming that it had already lodged at least one such action under seal and that it was in the process of removing the case from the shadows.") (attached as Exhibit F).

Plaintiffs have now opted for arbitration and the claims it made here will not be decided here. On May 26, 2016, Plaintiffs dismissed their claims against Johnson & Bell without prejudice to refiling the same claims in arbitration. (Notice of Voluntary Dismissal and of Intent to Pursue Requested Unsealing of Case File attached as Exhibit G). However, Plaintiffs also made the unusual request to have the record in this case unsealed. The request should be denied and the matter should remain under seal.

## ARGUMENT

"Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, 104 S. Ct. 2199, 2209, 81 L. Ed. 2d 17 (1984); Fed. R. Civ. P. 26. Under Rule 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense…" and seal all or part of a matter.

3

Courts in the Seventh Circuit have recognized that, where parties have agreed to arbitrate a dispute, cases may properly be kept under seal at least until such time that a decision is made as to whether the case will proceed in arbitration or in the court. *Walker v. Gore*, No. 1:08-cv-0549-DFH-WTL, 2008 WL 4649091 (S.D. Ind. Oct. 20, 2008). To that end, Justice Easterbrook has remarked that "[p]eople who want secrecy should opt for arbitration. When they call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials." *Union Oil of California v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

In *Walker v. Gore*, the Southern District of Indiana ruled to keep the matter under seal at least until it decided whether or not arbitration would be compelled. The defendants argued that the plaintiffs should not be able to avoid the effects of confidentiality and arbitration provisions after having agreed to them, and the court found the argument persuasive. Specifically, the court held that "[t]he reason is that the parties agreed to private arbitration of their disputes." *Walker*, 2008 WL 4649091, at *1. The court went on to note that the best argument for sealing at least the contracts and the complaint is that "defendants are clearly entitled to compel arbitration of all claims asserted in this action, and that the case remains at the very beginning of the litigation process, where the parties may have reached a settlement before the defendants even file their expected (and probably meritorious) motion to compel arbitration." *Id.* at *2.

The exact same rationale applies here and the allegations should remain under seal. Through their agreement to arbitrate, Plaintiffs and Johnson & Bell opted for privacy and that is a choice that should be respected. Here, Johnson & Bell did not call on the courts and Plaintiffs are no longer calling on the courts. Instead, as agreed by the parties, this is a matter that will be decided in a private arbitration and the allegations of the complaint should therefore remain private.

Moreover, because Plaintiffs have opted for arbitration, this Court will not be called on to address any of the disputed issues raised by Plaintiffs' pleading and maintaining the case under seal is warranted. Given Plaintiffs' voluntary dismissal, the court record will largely consist only of Plaintiffs' self-serving positions stated in their complaint. The defenses will not be presented and the court will not rule on the disputed issues. Accordingly, the primary reason for disclosure – knowing what material is in the judicial record – does not exist. *See Baxter Int'l, Inc. v. Abbott Labratories*, 297 F. 3d 544, 545 (7th Cir. 2002) ("[s]ecrecy is fine at the discovery stage, before the material enters the judicial record").

Further concerning should be the fact that Plaintiffs' counsel has already publically touted this case in the press even though it is under seal. This is a case where the issues were never joined, no discovery has been initiated and no substantive rulings have been made. Thus, there is little or no legitimate purpose to be served by unsealing the one-sided, self-serving, now-withdrawn allegations, and there are concerns of protecting Johnson & Bell from "annoyance, embarrassment, oppression, or undue burden or expense" referenced in Rule 26.

Accordingly, all key factors weigh in favor of maintaining the matter under seal. For all of the foregoing reasons, Plaintiffs' motion to unseal should be denied.

WHEREFORE, Defendant Johnson & Bell LTD, respectfully requests that this Court deny "Plaintiffs' Motion to Unseal Case" and grant such other and further relief as this Court deems just and proper.

Respectfully Submitted,

WILLIAMS MONTGOMERY & JOHN LTD.

By: _____
Attorney for Defendants

5

Michael C. Bruck
Williams Montgomery & John Ltd.
233 South Wacker Drive, Suite 6100
Chicago, Illinois 60606
312-443-3200
mcb@willmont.com

# Exhibit A

Jason Shore and Coinabul, LLC v. Johnson & Bell, Ltd.
USDC for the Northern District of Illinois Case No. 16CV4363
Defendant's Response to Plaintiffs' Motion to Unseal Case

1:16-cv-04363
Judge Milton I. Shadur
Magistrate Judge Susan E. Cox

IN THE UNITED ST
FOR THE NORTHERN DISTRIC

JASON SHORE and COINABUL, LLC,
individually and on behalf of all others
similarly situated,

               Plaintiffs,

    v.

JOHNSON & BELL, LTD, an Illinois
corporation,

               Defendant.

DOCUMENT FILED PROVISIONALLY
UNDER SEAL

**RECEIVED**

APR 1 5 2016

THOMAS G. BRUTON
CLERK, U S DISTRICT COURT

## VERIFIED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Jason Shore and Coinabul, LLC bring this Verified Class Action Complaint and

Demand for Jury Trial ("Complaint") against Defendant Johnson & Bell, LTD ("Johnson &

Bell") to put an end to Defendant's practice of systematically exposing confidential client

information and storing client data without adequate security. Plaintiffs allege as follows upon

personal knowledge as to themselves and their own acts and experiences, and, as to all other

matters, upon information and belief, including investigation conducted by their attorneys.

### NATURE OF THE ACTION

1.    Johnson & Bell is a Chicago-based law firm with more than 100 attorneys and

practice groups ranging from administrative law to professional liability.[1] To manage those

attorneys and groups, Johnson & Bell operates several computer systems that allow clients and

employees to connect remotely to internal servers, access and transmit emails, and manage and

record detailed time records of work carried out for clients. These computers systems, in turn,

---

[1]    *Practices - Johnson and Bell*, http://johnsonandbell.com/practices-home/ (last visited
Apr. 15, 2016).

connect with other Johnson & Bell computer systems—including systems which contain highly sensitive client data.

2.      Unfortunately, Defendant fails to keep its clients' information secure. Defendant's computer systems suffer from critical vulnerabilities in its internet-accessible web services. As a result, confidential information entrusted to Johnson & Bell by its clients has been exposed and is at great risk of further unauthorized disclosure (if it hasn't already been disclosed).

3.      Johnson & Bell has injured its clients by charging and collecting market-rate attorneys' fees without providing industry standard protections for client confidentiality. The longer Johnson & Bell is allowed to maintain its vulnerable systems, the more likely its clients will become victims of a data breach. Alternatively, if a breach has already occurred, each day that passes without knowledge and notice of a breach puts client information in greater danger of widespread distribution. As it stands, Johnson & Bell has failed in its obligations to keep its clients' confidential information secure.

4.      Accordingly, this putative class action lawsuit seeks: (i) to compel Johnson & Bell to stop exposing its clients' confidential information to unauthorized parties (which it can do by implementing industry standard protocols); (ii) to compel Johnson & Bell to allow an independent, third-party firm to conduct a security audit; (iii) to inform Johnson & Bell's clients that their confidential information has been exposed; (iv) damages; and (v) attorneys' fees and costs.

## PARTIES

5.      Plaintiff Jason Shore is a natural person and citizen of the State of California.

6.      Plaintiff Coinabul, LLC is a Wyoming limited liability company.

7.      Defendant Johnson & Bell, LTD is an Illinois corporation with its headquarters

2

located at 33 West Monroe Street, Suite 2700, Chicago, Illinois 60603. Johnson & Bell conducts business throughout this District, the State of Illinois, and the United States.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

9.  This Court has personal jurisdiction over this case because Defendant is headquartered and conducts its principal operations in this state.

10. Venue is proper in this District under 28 U.S.C. § 1391(b) as (i) Defendant's principal place of business is in this District, and (ii) most of the operative facts giving rise to Plaintiffs' complaint occurred in this District.

## FACTUAL ALLEGATIONS

**I.   Johnson & Bell Promises to Keep Information Secure and Markets Itself as a Cybersecurity Expert.**

11. Johnson & Bell is a Chicago-based law firm with more than 100 attorneys practicing in a wide range of areas.[2] Some of Johnson & Bell's largest clients include those in the insurance and health care industries, and companies seeking to merge with and/or acquire other entities. Johnson & Bell also handles confidential corporate compliance and investigatory work.

12. Like any large firm, Johnson & Bell receives a vast amount of confidential client information, including financial records, trade secrets, sensitive communications, and personal information (*e.g.*, addresses, contact information, and social security numbers) ("Confidential

---

[2]   *Practices - Johnson and Bell*, http://johnsonandbell.com/practices-home/ (last visited Apr. 15, 2016).

Client Information"). Johnson & Bell also generates additional Confidential Client Information from that client data as a part of litigation, due diligence, investigation, time and billing records, and its day-to-day business.

13.     Moreover, Johnson & Bell relies on a suite of computer systems to provide its legal services. Those include, amongst others, a time entry system, a virtual network system, and an email system, all of which are designed to interface with the internet (*i.e.*, to be publicly accessible). The computer systems exposed to the internet are also connected to many of Johnson & Bell's internal systems. A vulnerability in one of these systems can expose Johnson & Bell's entire computer system and all the Confidential Client Information it contains.

14.     Johnson & Bell knows that modern clients demand assurances that their confidential data is secure while kept on its computer systems. That is why Johnson & Bell markets itself to existing and potential clients as an expert in data security. In 2014, Joseph R. Marconi, a shareholder at Johnson & Bell, with assistance from an associate, wrote an article showcasing Johnson & Bell's purported expertise, noting that "[d]ata management safeguards can prevent possible legal malpractice from cyber-security breaches.[3] Marconi wrote:

> Given the confidential and valuable information passed between clients and their lawyers due to the attorney-client privilege, lawyers' and law firms' computer and e-mail accounts have become favorite targets [of hackers]. … In addition, mobile devices and both cloud-based and in-firm corporate networks and email systems are susceptible to electronic hacking where a hacker will illegally gain access to electronic information using a variety of more sophisticated methods. Law firms and lawyers present a particularly appealing target for hackers because the mandatory confidentiality of the attorney-client relationship creates a virtual treasure trove of sensitive client information—such as social security numbers, medical information, trade secrets, wire transfer instructions, privileged litigation

---

[3]     Joseph R. Marconi and Brian C. Langs, *Don't Let Cybersecurity Breaches Lead to Legal Malpractice: The Fax Is Back*, ISBA Mutual Practice Updates, https://www.isbamutual.com/liability-minute/donrsquot-let-cybersecurity-breaches-lead-to-legal (last visited Apr. 15, 2016). A true and accurate copy of the article is attached as Exhibit 1).

4

communications and strategy, and internal corporate strategies—much of which can be very valuable to an array of criminal enterprises.

15.     Marconi acknowledged that lawyers are under a duty to protect client data,

stating:

Illinois Rule of Professional Conduct 1.6(a) requires a lawyer practicing in Illinois to make reasonable efforts to ensure the confidentiality of client information, including electronically stored client information. ... While technology utilization is necessary, the prudent lawyer will also realize that the use of technology to electronically store and transfer sensitive client information necessitates proactive implementation of safeguards that will help in the prevention and defense of this information's electronic theft.

16.     Marconi then recommended specific precautions to protect client data:

Every law firm should maintain computer-use policies requiring employees to use and routinely update passwords for e-mail, document management systems, mobile devices, and laptops. Intranets, extranets [e.g., web portals], and Citrix-like virtual desktops also invariably require password protection. ... Other safeguards may include limiting who may access particular materials electronically and when they may share, print, or alter data. Finally, every firm's computer-use policy should communicate to its employees, (1) the seriousness of the firm's confidentiality obligation to its clients, (2) the very real possibility of a cyber-attack, and (3) the procedure for reporting a potential data breach or suspected disclosure.

17.     As Johnson & Bell's marketing demonstrates, it promises to its clients that it takes

confidentiality and cybersecurity seriously. Unfortunately, Johnson & Bell utterly fails to deliver

on that promise. By visiting Johnson & Bell's public websites, it is revealed that Defendant has

failed to keep its Confidential Client Information secure.

**II.     Johnson & Bell Has Failed To Secure Confidential Client Information, Exposing the Data to Hackers and Thieves.**

As introduced above, Johnson & Bell maintains several internet-accessible computer

networks. A review of public information, though, shows that Johnson & Bell has failed to

maintain up-to-date security. As a result, Johnson & Bell has exposed Confidential Client

Information. It is only a matter of time until hackers learn of these vulnerabilities (if they have

5

not already). As a result, Johnson & Bell's clients not only face the current harm of having their

Information exposed but the risk that hackers will gain access to confidential billing records, be

able to intercept and decrypt attorney-client communications, and obtain additional documents

stored by Johnson & Bell.

### A. Defendant's Webtime Server Leaves Sensitive Billing Records Exposed.

18.     To let its staff and attorneys track the time they spend working on each matter,

Defendant maintains a time-tracking system that is accessible from the internet. On its website

(jbltd.com), Johnson & Bell operates a "Webtime" service developed by Rippe & Kingston, an

information technology company. *See* Figure 1. There, attorneys and others are prompted to

submit their usernames and passwords. Once submitted, the users are taken to a system where

they are able to enter and track the time spent on client matters. The time tracking system

maintains each record submitted by each attorney.



**(Figure 1.)**

19.     Defendant's system, though, does not limit access to individuals with valid

usernames and passwords. Instead, hackers can breach its system with impunity because

Defendant has improperly configured the service and left it running out-of-date software. A

review of the publically available specifications of Defendant's Webtime service shows that it is

6

more than a decade old and has not been updated with critical security patches.

20.     Defendant's Webtime time tracking system is built on a "JBoss Application Server" which implements Java (a virtual computing language) for applications. By using Java, service providers are able to let users run applications on myriad devices without having to rewrite the application for each type device (*e.g.*, a Java application can run on a Mac and a PC without modification).

21.     Johnson & Bell's JBoss system is woefully out-of-date and suffers from a critical vulnerability. Defendant's JBoss system is listed as running version 4.0.2. A review of industry literature reveals that that version of JBoss was introduced in 2005 and is "End of Life," or, no longer supported or recommended for use. For comparison, the latest version of JBoss (now called WildFly) is version 10.

22.     JBoss 4.0.2 has been termed End of Life for an important reason: it is insecure. In September 2013, the National Institute of Standards and Technology, sponsored by the Department of Homeland Security, updated its National Vulnerability Database to include a vulnerability specific to this version of JBoss. NIST reported that the vulnerability was "network exploitable," had a "low" level of access complexity, and that it "[a]llows unauthorized disclosure of information; [a]llows unauthorized modification; [and a]llows disruption of service."[4] That is, JBoss version 4.0.2 allows hackers to access previously protected information with little to no effort.

23.     The risk of this vulnerability is not just theoretical. Computer security experts have recently observed an ongoing and "widespread campaign" attacking JBoss computer

---

[4]     *NVD – Detail*, https://web.nvd.nist.gov/view/vuln/detail?vulnId=CVE-2013-4810 (last visited Apr. 15, 2016).

7

systems of the exact type used by Defendant.[5] In these attacks, "[a]dversaries are exploiting known vulnerabilities in unpatched JBoss servers [just like Defendant's out-of-date servers] before installing [malicious software], identifying further network connected systems, and installing SamSam ransomware to encrypt files on these devices." That is, hackers are targeting entities that have not updated their JBoss servers and then holding sensitive data hostage until a ransom is paid.

24.     On April 4, 2016, a user commented about this attack with the following:

We were hit by this ransomware and I wasn't sure if it was jboss related or a compromised user account. Good to at least know it was jboss related. We had port 443 open to the world on an aging server :([6]

25.     That user, just like Johnson & Bell, ran an outdated server that was exposed to the internet ("port 443 open to the world") and was attacked. It is just a matter of time until a hacker discovers Johnson & Bell's vulnerable server and further exposes Confidential Client Information.

### B.     Defendant's VPN Server Fails to Protect Client Data.

26.     To allow its attorneys and staff access to documents and files while they are offsite, Johnson & Bell operates a virtual private network. But just like its Webtime system, Johnson & Bell's remote computer system is vulnerable to attacks.

27.     Employees physically present in a corporation's office are able to access internal computer networks, or *intranets*. Intranets often include private webpages for employees, shared storage systems, printer controls, and more. Normally, intranets are isolated from external network traffic (the internet). As such, employees located offsite are unable to access the internal

---

[5]     Cisco Talos Blog: SamSam: The Doctor Will See You, After He Pays The Ransom, http://blog.talosintel.com/2016/03/samsam-ransomware.html?m=1 (last visited Apr. 15, 2016).
[6]     *Id.*

8

resources unless provided a means to virtually connect to the intranet. Defendant remedied this by implementing a "virtual private network" or "VPN." By using the VPN, offsite employees use encrypted communication protocols to connect to Johnson & Bell's internal networks. While use of a VPN is industry standard, Defendant's implementation is not.

28.     Specifically, Defendant's VPN supports insecure renegotiation, leaving it vulnerable to man-in-the-middle attacks.

29.     This is a serious security deficiency, especially considering the purpose of a VPN: to securely connect to a company's servers housing its most sensitive information. Most troubling is that Johnson & Bell's VPN system supports insecure renegotiation, opening the door to a "Man In The Middle Attack." A Man In The Middle Attack is a well-known type of attack used by, amongst others, computer hackers,[7] spy agencies,[8] and foreign governments[9] to eavesdrop on private communications and steal Confidential Client Information.

30.     And, because Johnson & Bell's VPN users are mobile and working from remote locations, a Man In The Middle Attack is a serious concern. Defendant's attorneys accessing Johnson & Bell's internal document repositories through the VPN likely do so from hotels, conference centers, opposing counsel's offices, cafes, and/or public networks. Each location presents a new place attackers could gain access to Johnson & Bell's systems and Confidential Client Information. Simply by using its VPN solution, then, Defendant and its attorneys can expose Johnson & Bell's Confidential Client Information.

---

[7]     *DoubleDirect: Hackers Redirect High-Traffic Sites Via New MITM Attack*, http://www.tripwire.com/state-of-security/latest-security-news/doubledirect-hackers-redirect-high-traffic-sites-using-new-man-in-the-middle-attack/ (last visited Apr. 15, 2016).
[8]     *NSA disguised itself as Google to spy, say reports – CNET*, http://www.cnet.com/news/nsa-disguised-itself-as-google-to-spy-say-reports/ (last visited Apr. 15, 2016).
[9]     *Chinese government launches man-in-middle attack against iCloud [Updated] | Ars Technica*, http://arstechnica.com/security/2014/10/chinese-government-launches-man-in-middle-attack-against-icloud/ (last visited Apr. 15, 2016).

### C.   *Johnson & Bell's Email System Vulnerability*

31.   Rather than use a third-party email provider, such as Google's Gmail, Johnson & Bell hosts its own email server. Johnson & Bell's attorneys and staff use this email server to send, receive, and store communications between them and opposing counsel, courts, and, importantly, its clients. Johnson & Bell also uses this email system to transmit sensitive and confidential documents as email attachments. While Johnson & Bell attempts to protect the content of the communications from prying eyes by using encryption, its attempts fail. Johnson & Bell's email system has broken security that leaves clients' confidential communications and documents exposed to unauthorized disclosure.

32.   Specifically, Johnson & Bell's email server:

- Supports SSL 2, which is obsolete, insecure, and is exploited by the "DROWN" attack, and

- Supports 512 bit export suites and is vulnerable to the "FREAK" attack.

33.   These vulnerabilities demonstrate that Johnson & Bell has deficient security and fails to protect Confidential Client Information. However, the fact Johnson & Bell's email server is exploitable by the DROWN attack is concerning. The DROWN attack (short for Decrypting RSA with Obsolete and Weakened ENcryption) "allows attackers to break the encryption and read or steal sensitive communications, including passwords, credit card numbers, trade secrets, or financial data."[10] By using a DROWN attack, hackers can gain access to a server's secrets "in under 8 hours at a cost of $440."[11] And once the server is breached, hackers can access the contents of Johnson & Bell's previously encrypted emails and attachments.

34.   For instance, a law firm based in Panama notoriously suffered what is likely the

---

[10]   *DROWN Attack*, https://drownattack.com (last visited Apr. 15, 2016).
[11]   *Id.*

10

largest data breach of all time, likely stemming from the DROWN attack.[12] Over 2 *terabytes* of

client information was stolen and leaked to investigative journalists. While the result of that

breach has been the unearthing of widespread corruption, there are undoubtedly thousands of

innocent clients whose private information has been disclosed.[13] While the exact means of the

breach are not known, what is known is that the firm had poor network security. Notably, the

firm "failed to update its Outlook Web Access login since 2009 and not updated its client login

portal since 2013," leaving it "vulnerable to the DROWN attack, a security exploit that targets

servers supporting the obsolete, insecure SSL v2 protocol."[14]

**III.    Johnson & Bell's Exposure of Client Data Makes a Data Breach Inevitable.**

35.    Johnson & Bell markets itself as a sophisticated firm capable of representing

individuals and companies with complicated legal issues. Hospitals, insurance companies, and

more, trust Johnson & Bell with their sensitive information and trade secrets. And because

hackers and corporate spies covet such data, Johnson & Bell is a target for an attack.[15] As such,

---

[12]    *Panama Papers law firm says it is a hacking 'victim'*,
http://www.usatoday.com/story/news/2016/04/06/panama-papers-law-firm-says-hacking-victim/82695208/ (last visited Apr. 15, 2016).
[13]    *Giant Leak of Offshore Financial Records Exposes Global Array of Crime and Corruption · ICIJ*, https://panamapapers.icfj.org/20160403-panama-papers-global-overview.html (last visited Apr. 15, 2016) ("As with many of Mossack Fonseca's clients, there is no evidence that Chan used his companies for improper purposes. Having an offshore company isn't illegal. For some international business transactions, it's a logical choice.")
[14]    *Panama Papers: The security flaws at the heart of Mossack Fonseca (Wired UK)*, http://www.wired.co.uk/news/archive/2016-04-06/panama-papers-mossack-fonseca-website-security-problems (last visited Apr. 15, 2016).
[15]    In fact, insurance companies and those in the healthcare industry (regulated companies that are under separate duties to protect highly sensitive information), arguably have their own duty to properly vet the security of any law firm they work with to ensure it will properly secure client data.
        Such companies, which are some of Johnson & Bell's largest clients, are also at great risk of having their data stolen by hackers. Indeed, hackers prize patients' medical data because of its value on the black market. Entire online "underground exchanges" have been created "where hackers sell [stolen] information," such as "names, birth dates, policy numbers, diagnosis codes

Johnson & Bell's clients expect—based on the long-standing attorney obligation to maintain client confidentiality and Johnson & Bell's own marketing—that Johnson & Bell will protect Confidential Client Information with equally sophisticated methods or at least industry standards. As it stands, Johnson & Bell falls far short of those standards.

36.     Simply put, with the Confidential Client Information it maintains and the low security it has employed, Johnson & Bell is a data breach waiting to happen. Presently, Johnson & Bell's time record system can be accessed without any username or password (or any other credential), meaning Johnson & Bell exposes, amongst other things:

        (i)      The identity of all of its current clients;

        (ii)     The identity of clients that have ended their relationship with Johnson & Bell;

        (iii)    The identity of clients involved in non-public investigations (both internal and external), confidential transactions, and litigation under seal;

        (iv)    The details and scope of each client's representation;

        (v)     Trade secrets; and,

        (vi)    Discussions shared under the supposed protections of attorney-client privilege.

37.     Johnson & Bell's exposure of client billing records could be devastating. A company anticipating toxic tort lawsuits might retain Johnson & Bell to investigate its potential liability—unauthorized disclosure of that fact alone might prove fatal. Or, the time records might reveal investigations into managers accessing websites especially prone to distributing malware

---

and billing information." *See Your medical record is worth more to hackers than your credit card | Reuters*, www.reuters.com/article/2014/09/24/us-cybersecurity-hospitals-idUSKCN0HJ2l120140924 (last visited Apr. 15, 2016). On these exchanges, "medical information is worth 10 times more than [] credit card number[s]." *Id.*

     Johnson & Bell's clients in the medical and insurance industry have undoubtedly sent Johnson & Bell such sensitive information. Just by retaining those documents, then, Johnson & Bell is at an increased risk of being targeted by hackers seeking to obtain those valuable records.

and viruses (*e.g.*, pornographic websites) while at work and then disseminating inappropriate materials to subordinates. Undoubtedly, Johnson & Bell's time records contain incredibly sensitive information that, if exposed, will reveal criminal investigations, sexual harassment suits, pre-litigation investigations, and more. Given that, Johnson & Bell is providing insufficient security to protect the sensitive information at issue.

38.     Moreover, once attackers have accessed the time records, they will use the data to social engineer (or "phish" for) further hacks. Recently, Proskauer Rose LLP revealed that it suffered from a data breach stemming from a phishing attack.[16] It was reported that Proskauer Rose "complied with an email from an 'unauthorized third party' claiming to be a senior executive making a purportedly 'legitimate request' for employees' 2015 W-2 tax forms."[17] That is, the hackers used information sourced from previous attacks to convince Proskauer Rose that they were a legitimate party that had need for sensitive information.

39.     Worse, with the Confidential Client Information in Johnson & Bell's time records, a hacker will invariably phish each of Johnson & Bell's clients. By knowing the name of the attorney working a matter, the nature of the representation, and up-to-date details (*e.g.*, that a meeting occurred on a specific date at a specific time with specific people), the hacker can impersonate Johnson & Bell attorneys or staff (or their clients or vendors) to obtain from its clients or its own employees (1) additional details of trade secrets or confidential information, (2) financial data, or (3) methods to infiltrate additional computers and networks.

40.     The risk of such targeted phishing attacks are real and are called "spear phishing attacks." Regarding spear phishing, the FBI states:

---

[16]     *Proskauer Rose Revealed Worker Tax Info In Phishing Scam - Law360*, http://www.law360.com/privacy/articles/781372 (last visited Apr. 15, 2016).
[17]     *Id.*

> [C]riminals need *some* inside information on their targets to convince them the e-mails are legitimate. They often obtain it by hacking into an organization's computer network (which is what happened in the above case) or sometimes by combing through other websites, blogs, and social networking sites. Then, they send e-mails that look like the real thing to targeted victims, offering all sorts of urgent and legitimate-sounding explanations as to why they need your personal data.
>
> Finally, the victims are asked to click on a link inside the e-mail that takes them to a phony but realistic-looking website, where they are asked to provide passwords, account numbers, user IDs, access codes, PINs, etc.
>
> **Criminal gain, your loss.** Once criminals have your personal data, they can access your bank account, use your credit cards, and create a whole new identity using your information.[18]

41.     Overshadowing these concerns, though, is that once hackers have breached the

Webtime system, there's no indication that they will be stopped. Indeed, if the described

vulnerabilities are any indication, Johnson & Bell's computer systems likely have many more

security deficiencies not identified herein. Johnson & Bell's clients, though, are left in the dark

about Defendant's lax security practices.

**IV.     Johnson & Bell Fails in its Obligation to Keep Confidential Client Information Secure, Lagging Behind Industry Peers.**

42.     Hackers know that law firms like Johnson & Bell routinely handle and exchange

highly confidential trade secrets, business plans, financial data, and myriad personal information.

That is why the risk of a breach is particularly acute for Johnson & Bell. Yet, individuals and

businesses trust that when they hand over such information to Johnson & Bell, it is obligated to

use industry standard protections to guard that information. But while other firms are taking the

threat of breaches seriously, Johnson & Bell does not, falling short of its peers.

**A.     Law Firms are on Notice that Hackers are Targeting Them.**

---

[18]     FBI — Spear Phishing,
https://www.fbi.gov/news/stories/2009/april/spearphishing_040109, (last visited Apr. 15, 2016).

14

43.     The ABA notes that law firms are required by "[t]he ethics rules," "common law," "contractual and regulatory obligations to protect information relating to clients and other personally identifiable information."[19] Illinois Supreme Court Rule 1.6(e) recognizes the long-standing duty attorneys have to maintain client confidentiality, stating, "[a] lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client."[20]

44.     The comments to the rule go on to explain that the "reasonable efforts" attorneys must use to protect client data varies based on "the sensitivity of the information, the likelihood of disclosure if additional safeguards are not employed, the cost of employing additional safeguards, the difficulty of implementing the safeguards, and the extent to which the safeguards adversely affect the lawyer's ability to represent clients (e.g., by making a device or important piece of software excessively difficult to use)."[21] And, when attorneys "transmit[] a communication that includes information relating to the representation of a client, [e.g., through email or VPN] the lawyer must take reasonable precautions to prevent the information from coming into the hands of unintended recipients."[22]

45.     The Illinois State Bar Association additionally warns attorneys about the risks of failing to maintain proper data security:

> There is good reason to fear that hackers might be coming after your law firm, Brooks says. "The legal industry, in particular, is the target of a lot of hacker attacks right now,' he says. "We're targets because we handle sensitive financial information and we're behind the curve in terms of security."

---

[19]     ABA, *Security*, http://www.americanbar.org/publications/techreport/2015/Security.html (last visited Apr. 15, 2016).
[20]     Article VIII. Illinois Rules of Professional Conduct of 2010, http://www.illinoiscourts.gov/supremecourt/rules/art_viii/artviii_new.htm (last visited Apr. 15, 2016).
[21]     *Id.*
[22]     *Id.*

15

...

> It's larger firms that face the most risk, Flaming says. That's "because ... they're much bigger targets, and [] the data they hold is much more valuable to someone trying to hack in," he says.[23]

46.     Likewise, the ABA sends out periodic "Member Cyber Alerts" "in response to a request from the FBI that the ABA share Private Industry Notification cybersecurity alerts ('cyber alerts') with the legal community." In these alerts, the ABA notes "the increase in efforts to hack into the computer systems of legal professionals to reach the significant amounts of non-public information they hold. The FBI alerts are reminders to us all that we need to be alert to increasingly sophisticated cyber schemes."

**B.     Johnson & Bell has Ignored Calls to Bolster Security.**

47.     But while Johnson & Bell has shirked its responsibility to be "alert," other firms have started heeding the warnings from the FBI, the ABA, and state bar associations. For instance, in August 2015, "law firms including Sullivan & Cromwell; Debevoise & Plimpton; Paul, Weiss, Rifkind, Wharton & Garrison; Allen & Overy; and Linklaters" worked with cybersecurity experts to create the "Legal Services Information Sharing and Analysis Organization (LS-ISAO)." Through the LS-ISAO, these firms will "anonymously share threat data" so as to better protect the entire group.

48.     Similarly, other firms are spending resources to bolster security and to obtain international certification for information security management. Shook, Hardy & Bacon spent more than two years trying to earn the ISO 27001 certification to "make sure [it] had the

---

[23]     *Feeling Secure in the Cloud | Illinois State Bar Association,*
http://www.isba.org/ibj/2015/01/feelingsecurecloud (last visited Apr. 15, 2016).

processes in place so [its clients] had confidence that [it] w[as] doing the best [it] could."[24]

49.      Leading firms have also been "increasingly hiring dedicated security managers," conducting "third-party penetration tests, ... as part of regular risk assessment activities," and requiring security training for employees.[25] Law firms have been taking these steps because they "are already under an obligation to adhere to professional ethics rules that govern client confidentiality and privilege issues. Another motivation for law firms should be the horror stories that sweep the media with increasing regularity about corporate data breaches."[26]

50.      As the vulnerabilities discussed herein show, Johnson & Bell has not kept up with the rest of the legal industry in securing Confidential Client Information. While other firms are dedicating substantial resources to protect data, Johnson & Bell runs decade-old software presumably to save money. As a result, Johnson & Bell has exposed Confidential Client Information and made it accessible to hackers and thieves.

### FACTS SPECIFIC TO PLAINTIFFS

51.      On August 23, 2014, Plaintiffs retained Johnson & Bell for legal representation. On February 24, 2015, Johnson & Bell terminated its representation of Plaintiffs. In total, Plaintiffs paid Johnson & Bell $30,000 for legal services.

52.      During the time Defendant represented Plaintiffs, Plaintiffs transmitted to Defendant Confidential Client Data. Specifically, and following Defendant's instructions, Plaintiffs transmitted via email to Defendant confidential information about their clients, orders,

---

[24] *Law firm makes a case for security certification | CIO*, http://www.cio.com/article/2969323/security/law-firm-makes-a-case-for-security-certification.html (last visited Apr. 15, 2016).

[25] *A Soft Target For Hacks, Law Firms Must Step Up Data Security - Law360*, http://www.law360.com/articles/706312/a-soft-target-for-hacks-law-firms-must-step-up-data-security (last visited Apr. 15, 2016).

[26] *Id.*

processes, trade secrets, and other Confidential Client Data. Presently, Defendant maintains Plaintiffs' Confidential Client Data on its computer servers.

53.     In addition, Defendant maintains detailed records of the time attorneys and staff spent working on Plaintiffs' matter and stores those records electronically. In those time records, Defendant wrote detailed descriptions of confidential matters.

54.     Plaintiffs understood and expected that Johnson & Bell would use industry standard measures to protect their Confidential Client Data. Plaintiffs value their privacy and the privacy of their clients and customers. Plaintiffs would not have retained Defendant or provided their Confidential Client Data had they known that Defendant had lax security protocols and insecure systems.

55.     In fact, because Coinabul operated as federally regulated financial institution, Plaintiff Shore spoke with Defendant's agents and representatives about his expectation of privacy and security prior to retaining Defendant. Specifically, he discussed with Johnson & Bell that it needed to provide strong security to protect Plaintiffs' Confidential Client Data. Defendant assured Mr. Shore that it had sufficient security in place that would protect Plaintiffs' Confidential Client Data.

56.     Defendant has exposed, and continues to expose, Plaintiffs' Confidential Client Data.

**CLASS ALLEGATIONS**

57.     **Class Definition**: Plaintiffs Shore and Coinabul bring this action pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3) on behalf of themselves and a class of similarly situated individuals, defined as follows:

> All Johnson & Bell LTD clients that have had their client records maintained by
> Johnson & Bell LTD within the statute of limitations period, excluding insurance

18

companies and clients operating in the health care industry.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

58.     **Numerosity:** The exact size of the Class is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, there are thousands of individuals or entities in the Class, making joinder of each individual member impracticable. Ultimately, members of the Class will be easily identified through Defendant's records.

59.     **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members:

> (a)     Whether Defendant committed legal malpractice by breaching its contracts with Plaintiffs and the Class;
>
> (b)     Whether Defendant's conduct constitutes negligent legal malpractice;
>
> (c)     Whether Defendant has a duty to maintain the confidentiality of Plaintiffs' and the Class's Confidential Client Information;
>
> (d)     Whether Defendant breached its duty to maintain the confidentiality of Plaintiffs' and the Class's Confidential Client Information;
>
> (e)     Whether Defendant failed to implement industry standard data security

19

measures;

(f)     Whether Defendant has been unjustly enriched;

(g)     Whether Defendant breached its fiduciary duty to Plaintiffs and members
of the Class; and

(h)     Whether Plaintiffs and the members of the Class are entitled to equitable
relief as well as actual damages as a result of Defendant's conduct.

60.     **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the
Class. Plaintiffs and members of the Class sustained damages as a result of Defendant's uniform
wrongful conduct during transactions with Plaintiffs and the Class.

61.     **Adequate Representation:** Plaintiffs will fairly and adequately represent and
protect the interests of the Class, and has retained counsel competent and experienced in
complex class actions. Plaintiffs have no interest antagonistic to those of the Class, and
Defendant has no defenses unique to Plaintiffs.

62.     **Policies Generally Applicable to the Class:** This class action is appropriate for
certification because Defendant has acted or refused to act on grounds generally applicable to the
Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible
standards of conduct toward members of the Class, and making final injunctive relief appropriate
with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect
members of the Class uniformly, and Plaintiffs' challenge of those practices hinges on
Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to
Plaintiffs.

63.     **Superiority:** This case is also appropriate for class certification because class
proceedings are superior to all other available methods for the fair and efficient adjudication of

20

this controversy given that joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

**FIRST CAUSE OF ACTION**
**Breach of Contract (Legal Malpractice)**
**(On behalf of Plaintiffs and the Class)**

64.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

65.    Plaintiffs and Class members entered into contracts with Defendant for attorney services.[27] Within each contract, Defendant states:

> Document Retention. During the course of the representation, J&B shall maintain a file on your behalf. The file may include material such as pleadings, transcripts, exhibits, reports, contracts, certificates, and other documents as are determined to be reasonably necessary to the representation ("Your File"). Your File shall be and remain your property. J&B may also include in the file its attorney work product, mental impressions, and notes (collectively "Work Product"). The Work Product shall be and remain the property of J&B.

66.    Implicit in Defendant's Document Retention clause is that Johnson & Bell will

---

[27]    A true and accurate copy of Plaintiffs' engagement letter contract with Johnson and Bell is attached as Exhibit 2.

21

keep all documents and files confidential using reasonable methods.

67.     As detailed in this Verified Complaint, Defendant has breached the above contracts by exposing Plaintiffs' and the Class's Confidential Client Information. In addition, Johnson & Bell continuously breaches the above contracts by failing to safeguard Plaintiffs' and the Class's Confidential Client Information.

68.     At all times relevant to this action, Defendant acted willfully and with intent to breach contracts entered into with Plaintiffs and the Class. Specifically, Defendant (and its website developers and network security employees) programmed and implemented its Webtime, email, and VPN systems with inadequate safeguards.

69.     Plaintiffs and the Class have fully performed their contractual obligations.

70.     As a direct and proximate result of Defendant's breach and continuing breach of contract, Plaintiffs and the Class have been injured. Specifically, Plaintiffs and the Class have been injured because Johnson & Bell exposed their Confidential Client Information; they have suffered a diminished value of the services they received from Johnson & Bell; and they are threatened with irreparable loss of the integrity of their Confidential Client Information and further injury and damages from the theft of that information.

71.     Defendant's breach will continue unless enjoined by this Court. Plaintiffs and members of the Class are likely to succeed on the merits, are without adequate remedies at law for Defendant's continuing breach, are threatened with irreparable loss, injury, and damages unless the Court grants the equitable relief requested, and the equitable relief requested is also in the public interest.

72.     Plaintiffs and members of the Class will suffer substantially more from the denial of an order enjoining Defendant from further breaches than the Defendant would suffer from its

22

issuance.

73.     As such, Plaintiffs and the Class request that the Court enjoin Defendant from operating its Webtime, email, and VPN services until it implements industry standard security protocols to protect their Confidential Client Information and disconnecting its servers from external networks (*e.g.*, the internet). In addition, Plaintiffs and the Class seek an order compelling Defendant to inform clients that their Confidential Client Information is exposed on Defendant's computer systems and that they face a threat of unauthorized disclosure due to Johnson & Bell's substandard security measures.

74.     In addition, Plaintiffs and members of the Class have been harmed by Defendant's prior breach. Specifically, a portion of the attorneys' fees that Plaintiffs and the Class paid to Johnson & Bell were to be used by Johnson & Bell, in part, to pay for the administrative costs of data management and security (*i.e.*, to keep their Confidential Client Information secure).

75.     Defendant did not use those funds for the administrative costs of data management and security. Thus, Plaintiffs and the Class did not receive the contracted benefits.

76.     As such, Plaintiffs and the Class also seek to recover the damages suffered as a result of Defendant's breach of contract.

### SECOND CAUSE OF ACTION
#### Negligence (Legal Malpractice)
#### (On behalf of Plaintiffs and the Class)
#### (In the alternative to the First Cause of Action)

77.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein, excluding paragraphs 64-76.

78.     At all relevant times, an attorney-client relationship existed between Plaintiffs and members of the Class and Defendant.

79.     Defendant breached its duty to Plaintiffs and members of the Class by failing to use a reasonable degree of professional care and skill required in its representation of Plaintiffs and members of the Class. Specifically, Defendant failed to implement industry standard data security measures, resulting in the Vulnerabilities and the exposure of their confidential data. And, Defendant failed to disclose that it does not use industry data security measures.

80.     As a direct and proximate cause of Defendant's negligent conduct, Plaintiffs and members of the Class have incurred damages in the form of legal fees paid to Johnson & Bell. Specifically, Plaintiffs and members of the Class would not have paid legal fees to Johnson & Bell or they would have paid significantly less had Defendant disclosed that it does not use industry standard data security measures.

81.     Moreover, Plaintiffs and members of the Class are continuously injured because Defendant's lax security measures have placed their confidential information at extreme risk of theft and unauthorized disclosure and are threatened with irreparable loss of trade secrets, financial loss, and other losses.

82.     Defendant's breach will continue unless enjoined by this Court. Plaintiffs and members of the Class are likely to succeed on the merits, are without adequate remedies at law, are threatened with irreparable loss, injury, and damages unless the Court grants the equitable relief requested, and the equitable relief requested is also in the public interest.

83.     Plaintiffs and members of the Class will suffer substantially more from the denial of an order enjoining Defendant from further unfair or deceptive conduct than the Defendant would suffer from its issuance.

84.     As such, Plaintiffs and the Class request that the Court enjoin Defendant from operating all internet-accessible portals (including its time entry portal) until it implements

24

industry standard security protocols to protect their confidential information. In addition,

Plaintiffs and the Class seek an order awarding damages and attorneys' fees and compelling

Defendant to inform its clients that its computer systems are not secure and that they face a threat

of unauthorized disclosure of confidential data due to Defendant's substandard security

measures.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**(On behalf of Plaintiffs and the Class)**
**(In the alternative to the First And Second Causes of Action)**

85.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

herein, excluding paragraphs 64-84.

86.     Plaintiffs hereby plead the Second Cause of Action in the alternative to the First

Cause of Action.

87.     Plaintiffs and members of the Class conferred a measurable monetary benefit on

Defendant. Defendant received and retained money belonging to Plaintiffs and the Class in the

form of a portion of the attorneys fees paid to Johnson & Bell. Defendant appreciates or has

knowledge of such benefit.

88.     A portion of the attorneys fees that Plaintiffs and the Class paid to Johnson & Bell

were to be used by Johnson & Bell, in part, to pay for the administrative costs of data

management and security (*i.e.*, to keep their Confidential Client Information secure).

89.     Under principles of equity and good conscience, Defendant should not be

permitted to retain the money belonging to Plaintiffs and members of the Class. Defendant has

failed to keep Plaintiffs' and Class members' Confidential Client Information from being

exposed and to implement industry standard data management and security measures to secure

that data, and under such circumstances, Defendant's retention of the benefit without payment

25

would be unjust.

90.     Accordingly, Johnson & Bell has received money from Plaintiffs and the Class through the unlawful practices alleged herein, which in equity and good conscience should be returned.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On behalf of Plaintiffs and the Class)**
**(In the alternative to the First, Second, and Third Causes of Action)**

91.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein, excluding paragraphs 64-90.

92.     Plaintiffs hereby plead the Third Cause of Action in the alternative to the First and Second Causes of Action.

93.     At all relevant times, Defendant owed Plaintiffs and the Class a fiduciary duty to maintain confidentiality of all matters discussed and investigated.

94.     Defendant breached its fiduciary duty to Plaintiffs and members of the Class by failing to use a reasonable measures to protect their Confidential Client Information. Specifically, Defendant failed to implement industry standard data security measures, resulting in the Vulnerabilities and the exposure of Confidential Client Information. And, Defendant failed to disclose that it does not use industry data security measures.

95.     At all times relevant to this action, Defendant acted willfully and with intent to breach its fiduciary duty to Plaintiffs and the Class. Specifically, Defendant (and its website developers and network security employees) programmed and implemented its Webtime, email, and VPN systems with inadequate safeguards.

96.     As a direct and proximate result of Defendant's breach, Plaintiffs and members of the Class have incurred damages in the form of legal fees paid to Johnson & Bell. Specifically,

26

Plaintiffs and members of the Class would not have paid legal fees to Johnson & Bell or they would have paid significantly less had Defendant disclosed that it does not use industry standard data security measures.

97.    Moreover, Plaintiffs and members of the Class are continuously injured because Defendant's lax security measures have exposed their Confidential Client Information, leaving that information at extreme risk of theft and further unauthorized disclosure and are threatened with irreparable loss of trade secrets, financial data, and other losses.

98.    Defendant's breach will continue unless enjoined by this Court. Plaintiffs and members of the Class are likely to succeed on the merits, are without adequate remedies at law, are threatened with irreparable loss, injury, and damages unless the Court grants the equitable relief requested, and the equitable relief requested is also in the public interest.

99.    Plaintiffs and members of the Class will suffer substantially more from the denial of an order enjoining Defendant from further breaching its fiduciary duty than the Defendant would suffer from its issuance.

100.    As such, Plaintiffs and the Class request that the Court enjoin Defendant from operating its Webtime, email, and VPN services until it implements industry standard security protocols to protect their Confidential Client Information and disconnecting its servers from external networks (e.g., the internet). In addition, Plaintiffs and the Class seek an order compelling Defendant to inform clients that their Confidential Client Information is exposed on Defendant's computer systems and that they face a threat of further unauthorized disclosure due to Johnson & Bell's substandard security measures.

101.    In addition, Plaintiffs and members of the Class have been harmed by Defendant's prior breaches of its fiduciary duty. Specifically, a portion of the attorneys fees that

27

Plaintiffs and the Class paid to Johnson & Bell were to be used by Johnson & Bell, in part, to pay for the administrative costs of data management and security (*i.e.*, to keep their Confidential Client Information secure).

102.    Defendant did not use those funds for the administrative costs of data management and security. As such, Plaintiffs and the Class are entitled to a full or partial forfeiture of the fees paid to Defendant during the time of the breach.

103.    In addition, Defendant unfairly profited from its breach of its fiduciary duty at the expense of Plaintiffs and the Class. Defendant did not use the paid-for funds to cover the costs of the data management and security owed to Plaintiffs and the Class, but rather used it to increase its profits.

104.    As such, Plaintiffs and the Class also seek to recover the damages suffered as a result of Defendant's breach of fiduciary duty and any profits Defendant unfairly generated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jason Shore and Coinabul, LLC, on behalf of themselves and the Class, respectfully request the following relief:

A.    A preliminary injunction enjoining Defendant from:

   i.    Exposing its Confidential Client Information through its internet-accessible portals;

   ii.    Compromising the integrity of client communications, and, in turn, Confidential Client Information, transmitted through its virtual private networks; and

   iii.    Exposing its Confidential Client Information through its email systems;

B.      An order certifying this case as a class action on behalf of the Class defined

above, appointing Jason Shore and Coinabul, LLC as representatives of the Class, and appointing

their counsel as class counsel; and,

C.      An order:

i.      Declaring that Defendant's conduct, as set out above, constitutes legal

malpractice, breach of contract, negligence, unjust enrichment, and/or

breach of fiduciary duty;

ii.     Requiring Defendant to inform its clients that its computer systems are not

secure and that they face a threat of further unauthorized disclosure of

Confidential Client Information due to its substandard security measures;

iii.    Compelling Defendant to allow an independent third-party firm to conduct

a security audit of its systems to ensure the integrity of Confidential Client

Information and determine the extent of any data breach that may have

already occurred;

iv.     Requiring Defendant to forfeit attorneys fees earned during its breach with

Plaintiffs and the Class and any profits diverted from spending on

cybersecurity;

v.      Awarding reasonable attorneys' fees and expenses;

vi.     Awarding pre- and post-judgment interest, to the extent allowable; and,

vii.    Awarding such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

29

Respectfully Submitted,

**JASON SHORE and COINABUL, LLC,**
individually and on behalf of all others similarly
situated,

Dated: April 15, 2016                    By: _____
                                              One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin Richman
brichman@edelson.com
Benjamin Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

Todd Logan*
EDELSON PC
329 Bryant Street
San Francisco, California 94107
Tel: 415.234.5260
Fax: 415.373.9495

30

# Exhibit 1

# Don't Let Cybersecurity Breaches Lead to Legal Malpractice: The Fax Is Back

## E-mail and wire fraud risks increase in a cloud-based world. Data management safeguards can prevent possible legal malpractice from cyber-security breaches.

*By Joseph R. Marconi & Brian C. Langs[1]*
*Johnson & Bell, Ltd.*
*Chicago*

Back in July of 2011, we warned of a then popular e-mail/fraudulent check scheme whereby lawyers would receive e-mails from alleged potential foreign clients looking to collect debts from customers. Those scammers convinced the unsuspecting lawyers to deposit fraudulent "settlement checks" into client accounts and wire the

> It's cloud's illusions that I recall
> I really don't know clouds at all...
> — *Judy Collins*

"clients' share" to foreign accounts after the bogus checks cleared. When the frauds were eventually uncovered by the banks, the lawyers were left with liability to the banks for the fraudulent check and wire transfers.[2] Since then, newer, more complex electronic scams have surfaced whereby hackers intercept e-mails between lawyers and clients that contain wire transfer instructions. After intercepting such an e-mail, the hacker changes the instructions in the e-mail to wire money to his own untraceable account. The hacker forwards his bogus wiring instructions to the unsuspecting recipient, all while "masking" his identity as the sender and making it appear to the recipient as if the instruction came from the correct sender, whether lawyer or client.

## Attorneys Present a Target for Sophisticated Hackers & Wire Fraud

Depending on your firm's sophistication and budget, the type of transaction involved, and the needs of your client, there are some preventative measures that can be considered with regard to protecting your firm and your clients from this and other wire transfer and electronic fraud schemes. Prevention techniques can include hiring a third-party e-mail encryption service provider or sending sensitive wire transfer instructions via facsimile rather than e-mail.[3]

This and other even more sophisticated electronic scams are becoming more prevalent. Given the confidential and valuable information passed between clients and their lawyers due to the attorney-client privilege, lawyers' and law firms' computer and e-mail accounts have become favorite targets. Whether an attorney transfers or stores confidential client information using password-protected corporate e-mail systems, "cloud computing,"[4] third-party off-site network administrator vendors, third-party hosted e-discovery management platforms, or a variety of other electronic data transfer or data storage solutions available through the Internet, the attorney inevitably faces an inherent risk that confidential client information will be susceptible to theft by a hacker or by an unscrupulous third-party employee. In the absence of reasonable, preventative, and precautionary measures, the lawyer also risks losses for the firm and its clients associated with such a theft.

Understanding how and why lawyers and law firms may be exposed to cybercrime is the first step in prevention. Because of the ever increasing capabilities of cloud computing and, with it, the proliferation of everyday use of mobile devices—such as smartphones, tablets, and laptops—lawyers and law firms put sensitive client material at risk simply by falling asleep on the train home or finishing a brief on the redeye. A misplaced smartphone or briefcase can result in serious consequences if a device ends up in the wrong hands. In addition, mobile devices and both cloud-based and in-firm corporate networks and email systems are susceptible to electronic hacking where a hacker will illegally gain access to electronic information using a variety of more sophisticated methods. Law firms and lawyers present a particularly appealing target for hackers because the mandatory confidentiality of the attorney-client relationship creates a virtual treasure trove of sensitive client information—such as social security numbers, medical information, trade secrets, wire transfer instructions, privileged litigation communications and strategy, and internal corporate strategies—much of which can be very valuable to an array of criminal enterprises.

# Professional Obligations of Attorneys in the Cloud

Illinois Rule of Professional Conduct 1.6(a) requires a lawyer practicing in Illinois to make reasonable efforts to ensure the confidentiality of client information, including electronically stored client information.[5] However, to be competitive in today's legal services market, lawyers and law firms must utilize the cost-saving and organizational advantages technology allows them to offer recurring and prospective clients. While technology utilization is necessary, the prudent lawyer will also realize that the use of technology to electronically store and transfer sensitive client information necessitates proactive implementation of safeguards that will help in the prevention and defense of this information's electronic theft. The extent and levels of necessary safeguards will likely be determined by the size of the law firm and its areas of practice, among other considerations. Depending on the specific needs of a firm or solo practitioner, there is a vast selection of cyber security precautions available but every law firm utilizing the technology discussed in this article should at least consider undertaking the following.[6]

# Implement Data Management Safeguards

Every law firm should maintain computer-use policies requiring employees to use and routinely update passwords for e-mail, document management systems, mobile devices, and laptops. Intranets, extranets, and Citrix-like virtual desktops also invariably require password protection. In today's corporate environments, while all networks and company laptops probably employ anti-virus protection, employees using personal laptops to perform work outside of the office must be required to install similar anti-virus protection. Firm policies should include periodic inspections of mobile devices and personal laptops to ensure that employees do not turn off password and/or anti-virus protection functions out of convenience or technical incompetence. Other safeguards may include limiting who may access particular materials electronically and when they may share, print, or alter data. Finally, every firm's computer-use policy should communicate to its employees, (1) the seriousness of the firm's confidentiality obligation to its clients, (2) the very real possibility of a cyber-attack, and (3) the procedure for reporting a potential data breach or suspected disclosure.

## Address Firm Data Retention Policies

A law firm likely houses an incredible amount of data through its electronic document management system and its corporate network and e-mail system. It should maintain clear policies regarding the length of time certain types of data will be stored, the strength of security to be maintained for certain stored data, and the procedures for eliminating unnecessary or outdated data. Just as a law firm is routinely required to destroy or shred sensitive hard copy materials, it must have procedures in place to completely remove and destroy sensitive electronic data from firm databases and to destroy unwanted or out of date firm equipment that may have housed sensitive information.

In conclusion, attorneys can and should take the necessary precautions to minimize the likelihood of cyber-security breaches, not only to give their clients peace of mind, but also to better shield themselves from third-party and first-party liabilities if a theft of information or other security breach actually occurs.

[1]Joe is a shareholder of Johnson & Bell, Ltd., and the chairman of the business litigation/transaction group and co-chair of the employment group. He appreciates Johnson & Bell associate, Brian C. Langs, for his assistance in the drafting of this article.

[2]For the full article, see Joseph R. Marconi and Victor J. Pioli, *Lawyers are Increasingly the Targets of Email/Fraudulent Check Schemes*, ISBA Mutual Insurance Company Liability Minute, (July 13, 2011 12:46 PM), http://www.isbamutual.com/liability-minute/lawyers-are-increasingly-the-targets-of-emailfraud.

[3]For more detailed information and recommendations regarding protecting your firm and your clients from e-mail interception and other types of check and wire transfer fraud, see Ronald Trubiana, *Title Agents and Lawyers: Be Wary and Protect Yourselves*, THE TRUSTED ADVISOR, October 2010, http://www.atgf.com/tools-

publications/trusted-adviser/check-and-wire-transfer-fraud-growth-industry (last visited July 25, 2014); ALTA Best Practices Frequently Asked Questions: Best Practices #3: Email Encryption, ATTORNEYS' TITLE GUARANTY FUND, http://www.atgf.com/tools-publications/alta-best-practices-frequently-asked-questions (last vistied July 25, 2014); Ronald Trubiana, *Update from ATG Administration: Five Ways to Reduce Exposure to Wire Fraud*, THE TRUSTED ADVISOR, April 2010, http://www.atgf.com/tools-publications/trusted-adviser/five-ways-reduce-exposure-wire-fraud (last visited July 25, 2014).

[4]"Cloud computing" can include receiving and sending e-mails on a smartphone or tablet; using a web-based email platform like Gmail, Yahoo! or Microsoft Outlook Web Access; or using products like Google Docs, Microsoft Office 365, Dropbox, SharePoint intranets/extranets, and Citrix Desktop as a Service ("DaaS"). As Formal Opinion 2011-200 of the Pennsylvania Bar Association Committee on Legal Ethics and Professional Responsibility aptly remarks, "cloud computing is merely a fancy way of saying stuff's not on your computer."

[5]*See* Ill. State Bar Ass'n Adv. Op. Prof'l. Conduct Nos. 96-10, 10-01; *see* also State Bar Ariz. Ethics Op. 09-04; N.Y. State Bar Ass'n Ethics Adv. Op. 842; Mass. Bar Ass'n Ethics Op.12-03; Pa. Bar Ass'n Form. Op. 2011-200 (all discussing substantially similar versions of subsection (a) of IRCP 1.6, entitled "Confidentiality of Information," and its applicability to a lawyer's ethical duty to protect electronically stored or transferred confidential client information).

[6]Much of the content below making particular suggestions for precautionary actions by law firms was taken from two excellent articles: Seth L. Laver, *Understanding and Protecting Against Cyber Risk*, FOR THE DEFENSE (DRI's Monthly Magazine), July 2012 at 46–49 and Rene L. Siemens and David L. Beck, *Cyber Insurance—Mitigating Loss from Cyber Attacks*, PERSPECTIVES ON INSURANCE RECOVERY NEWSLETTER, Summer 2012, http://www.pillsburylaw.com/publications/cyber-insurancemitigating-loss-from-cyber-attacks (last visited July 8, 2014). Both articles are recommended readings that provide detailed discussion of many of the issues raised in this article.

# Exhibit 2


### JOHNSON&BELL
TRIAL LAWYERS

Joseph R. Marconi

WRITER'S DIRECT DIAL: (312) 984-0211
E-MAIL: marconij@jbltd.com

August 22, 2014

***VIA ELECTRONIC SUBMISSION***
Jason Shore
jay@coinabul.com

> RE:  ***Yazan Hussein, et al. v. Coinabul, LLC, et al.***
> Court No:    14-cv-05735

Dear Mr. Shore:

This engagement letter confirms the engagement of Johnson & Bell, Ltd, an Illinois corporation ("J&B"), to represent you, individually, and Coinabul, LLC, ("you"), and the basis on which J&B will represent you. We appreciate your confidence and thank you for selecting J&B as your counsel for this matter.

1.    Scope of Representation.   J&B will be representing you in defense of the above referenced lawsuit.

Except as we may agree otherwise in writing, J&B will be representing only you and Coinabul, LLC will not be representing any of its parents, subsidiaries, affiliated entities, shareholders, partners, directors, officers, agents, or employees. J&B will advise you in connection with, and the scope of J&B's engagement and duties to you shall relate solely to, the defense of the *Hussein v. Coinabul, et al.* Litigation and the prosecution of possible cross-claims and counterclaims (or third-party claims) against any potentially liable persons or entities.

Because the representation is limited to a specific undertaking, J&B's acceptance of this engagement does not involve an undertaking to represent you or your interests in any other matter unless specifically requested by you and agreed to in writing by J&B.

Fees and Expenses. Our fees are based substantially upon hours charged, recorded in tenth of an hour increments, at J&B's scheduled rates which are in effect at the time the services are performed. Those scheduled rates are periodically adjusted, generally at the beginning of a calendar year. Reasonable adjustments to the scheduled rates may also be made in particular matters to account for the complexity of issues, uniqueness of the services provided, or previous experience of the attorneys involved. My present hourly rate is $400, Frank P. Nowicki $325,

CHICAGO OFFICE  PH (312) 372-0770  /  FAX (312) 372-9818          INDIANA OFFICE  PH (219) 791-1900  /  FAX (219) 791-1901
SUITE 2700 /  33 WEST MONROE ST  /  CHICAGO, IL 60603-5404          SUITE B /  11051 BROADWAY ST  /  CROWN POINT, IN 46307

WWW.JOHNSONANDBELL.COM


JOHNSON&BELL
TRIAL LAWYERS

Jason Shore
Coinabul, LLC
August 22, 2014
Page 2 of 4

Victor Pioli $300, Ann Zipfel $225 and Brian C. Langs is $200.00 and $125 for paralegals and project assistants.

Our invoices will include, in addition to charges for professional services, costs incurred on your behalf, including, but not necessarily limited to: filing fees, telephone toll charges, photocopy charges, messenger and overnight courier, postage costs for large volume mailings or special postage services, fax costs, word processing charges, secretarial and word processing operator overtime, librarian and computer research costs, and attorney and staff travel and meal costs which have not been billed directly to you. These items will be invoiced in accordance with our regularly established procedures and charges.

It is our policy not to advance the costs of services provided by outside vendors in amounts exceeding $500. We will forward invoices from such vendors to you for payment directly to the vendors. You agree to pay all such invoices promptly.

You have agreed to wire $30,000 to our law firm's account before close of business on Monday, August 25, 2014, as a condition precedent to our filing an appearance in the above referenced lawsuit. Said funds will be held in our segregated client's fund account as security for the payment of fees in this case. In addition to providing said security you have agreed to pay each invoice for services within fourteen (14) days of receipt of said invoice. It is the intent of both our firm and you that the security deposit will not be diminished and will remain intact as you will pay invoices as received in addition to maintaining the above deposit.

Termination of Representation. Either of us may terminate the engagement at any time for any reason by providing written notice, subject on the part of J&B to the requirements of applicable rules of professional conduct. Unless we agree to render additional legal services for you, J&B's representation of you and the attorney/client relationship will terminate upon the date J&B sends its disengagement letter to you.

Document Retention. During the course of the representation, J&B shall maintain a file on your behalf. The file may include material such as pleadings, transcripts, exhibits, reports, contracts, certificates, and other documents as are determined to be reasonably necessary to the representation ("Your File"). Your File shall be and remain your property. J&B may also include in the file its attorney work product, mental impressions, and notes (collectively "Work Product"). The Work Product shall be and remain the property of J&B.

At the termination of the representation and for a period of two (2) years thereafter, and provided there are no outstanding unpaid statements for fees and charges owed by you to J&B, you shall have the right on request to take possession of Your File, not including the Work Product. In such event, J&B at its expense may make and retain copies of all or portions of Your File. If you do not request possession of Your File within such two (2) year period, J&B will


JOHNSON&BELL
TRIAL LAWYERS

have no further responsibility for the retention and maintenance of Your File and may at its option dispose of all or parts of Your File without further notice to you.

Litigation Hold Directive. This litigation places an obligation upon you to preserve documents that might be relevant to the litigation. The preservation obligation includes both paper documents (writings on paper that can be read without the aid of computer devices such as correspondence, memoranda, handwritten notes and similar documents) as well as electronic documents (writings that can only be read through the use of computers). The "litigation hold" requires you to suspend your routine document retention/destruction policy immediately as it relates to documents that are required to be preserved. A directive should be sent to all employees to produce electronic copies of their relevant active files and make sure that all backup media which you are required to retain (i.e., actively used for information retrieval), are identified and stored in a safe place. Please institute this "litigation hold" in writing on a company wide basis, retain the writing in the event it is needed in the future, and forward a copy of the writing to us for our files. Please call us if you have any questions regarding your litigation hold responsibilities or need assistance in implementing the litigation hold.

Please signify your agreement to the arrangement for legal services described in this letter by returning to us a signed copy of the engagement letter. By signing this engagement letter on your behalf, the signatory warrants that he or she has the authority to engage us to represent you as set forth in this engagement letter. In most instances, we will not commence work on your behalf unless and until we have received the signed copy of this engagement letter. However, on occasion, we may be required to commence work on your behalf before receipt of the signed engagement letter. Under those circumstances, we retain the right to stop work and if needed, close the file, should you fail to sign and return the engagement letter.

We recommend that you seek the advice of independent counsel before signing this engagement letter. If we receive the signed engagement letter, we will presume that you have either consulted with independent counsel and chosen to go forward with our representation of you in the *Hussein v. Coinabul, LLC, et al.* Litigation or have considered the terms of the engagement letter and chosen to retain us without the need for the advice of independent counsel.

Arbitration of Disputes. Although we do not expect that any dispute between us will arise, in the unlikely event of any dispute under this agreement, including a dispute regarding the amount of fees or the quality of our services, such dispute shall be determined through binding arbitration with the mediation/arbitration services of JAMS Endispute of Chicago, Illinois. Any such arbitration shall be held in Chicago, Illinois unless the parties agree in writing to some other location. Each party to share the costs of the arbitration proceeding equally. Each party will be responsible for their own attorney's fees incurred as a result of the arbitration proceeding.

If any provision of this agreement is held to be void, voidable or unenforceable, the remaining provisions shall remain in full force and effect.


JOHNSON&BELL
TRIAL LAWYERS

Jason Shore
Coinabul, LLC
August 22, 2014
Page 4 of 4

We look forward to working with you in the *Hussein v. Coinabul, LLC, et al.* Litigation.

Very truly yours,

Johnson & Bell, Ltd.

Joseph R. Marconi

COINABUL, LLC, a Wyoming limited liability company

By: _____

Title: _____

Date: _____

#3831091

# Exhibit B

Jason Shore and Coinabul, LLC v. Johnson & Bell, Ltd.
USDC for the Northern District of Illinois Case No. 16CV4363
Defendant's Response to Plaintiffs' Motion to Unseal Case

TERMED,VALDEZ

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:14-cv-05735

Hussein v. Coinabul, LLC et al
Assigned to: Honorable James B. Zagel
Demand: $9,999,000
Cause: 28:1332 Diversity-Other Contract

Date Filed: 07/25/2014
Date Terminated: 06/18/2015
Jury Demand: Both
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

## Plaintiff

**Yazan Hussein**
*individually and on behalf of all others
similarly situated,*

represented by **Rafey S. Balabanian**
Edelson PC
329 Bryant Street
Suite 2C
San Francisco, CA 94107
(415)212-9300
Fax: 415.373.9435
Email: rbalabanian@edelson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alicia Elaine Hwang**
Edelson P.C.
350 North La Salle
Suite 1300
Chicago, IL 60654
(312) 572-7214
Email: ahwang@edelson.com
*ATTORNEY TO BE NOTICED*

**Benjamin Scott Thomassen**
Edelson P.C.
350 North Lasalle Street
Suite 1300
Chicago, IL 60654
(312) 589-6370
Fax: (312) 589-6378
Email: bthomassen@edelson.com
*ATTORNEY TO BE NOTICED*

**David Ira Mindell**
Edelson P.C.
350 North Lasalle
Suite 1300
Chicago, IL 60654
(312) 572-7213
Fax: (312) 589-6378
Email: dmindell@edelson.com

*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Coinabul, LLC**
*a Wyoming limited liability company*

represented by **Coinabul, LLC**
PRO SE

**Ann Elizabeth Zipfel**
Johnson And Bell, Ltd.
33 West Monroe Street
Suite 2700
Chicago, IL 60603
(312) 984-0282
Email: zipfela@jbltd.com
*TERMINATED: 03/03/2015*

**Brian C. Langs**
Johnson & Bell Ltd.
33 W. Monroe St.
Chicago, IL 60603
(312) 372-0770
Email: langsb@jbltd.com
*TERMINATED: 03/03/2015*

**Frank P. Nowicki**
Johnson & Bell, Ltd.
33 West Monroe Street
Suite 2700
Chicago, IL 60603
(312) 372-0770
Email: nowickif@jbltd.com
*TERMINATED: 03/03/2015*

**Joseph R. Marconi**
Johnson & Bell, Ltd.
33 West Monroe Street
Suite 2700
Chicago, IL 60603
(312) 984-0211
Fax: 312-372-9818
Email: marconij@jbltd.com
*TERMINATED: 03/03/2015*

**Defendant**

**Jason Shore**
*an individual,*

represented by **Jason Shore**
PRO SE

**Ann Elizabeth Zipfel**
(See above for address)
*TERMINATED: 03/03/2015*

**Brian C. Langs**
(See above for address)
*TERMINATED: 03/03/2015*

**Frank P. Nowicki**
(See above for address)
*TERMINATED: 03/03/2015*

**Joseph R. Marconi**
(See above for address)
*TERMINATED: 03/03/2015*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/25/2014 | 1 | COMPLAINT filed by Yazan Hussein; Jury Demand. Filing fee $ 400, receipt number 0752-9707533. (Attachments: # 1 Civil Cover Sheet)(Thomassen, Benjamin) (Entered: 07/25/2014) |
| 07/25/2014 | 2 | MOTION by Plaintiff Yazan Hussein to certify class (Thomassen, Benjamin) (Entered: 07/25/2014) |
| 07/25/2014 | | CASE ASSIGNED to the Honorable James B. Zagel. Designated as Magistrate Judge the Honorable Maria Valdez. (rc, ) (Entered: 07/25/2014) |
| 07/28/2014 | | SUMMONS Issued as to Defendants Coinabul, LLC, Jason Shore (pg, ) (Entered: 07/28/2014) |
| 08/04/2014 | 3 | SUMMONS Returned executed by Plaintiff Yazan Hussein regarding Summons in a Civil Case, Class Action Complaint and Demand for Jury Trial, Plaintiff's Motion for and Memorandum in Support of Class Certification, Letter Dated July 28, 2014 served on Coinabul, LLC on July 29, 2014; Answer due August 19, 2014. (Thomassen, Benjamin) (Docket text modified by Clerk's Office.) (tlm). (Entered: 08/04/2014) |
| 08/06/2014 | 4 | ATTORNEY Appearance for Plaintiff Yazan Hussein by David Ira Mindell (Mindell, David) (Entered: 08/06/2014) |
| 08/06/2014 | 5 | ATTORNEY Appearance for Plaintiff Yazan Hussein by Benjamin Scott Thomassen (Thomassen, Benjamin) (Entered: 08/06/2014) |
| 08/06/2014 | 6 | ATTORNEY Appearance for Plaintiff Yazan Hussein by Rafey S. Balabanian (Balabanian, Rafey) (Entered: 08/06/2014) |
| 08/06/2014 | 7 | ATTORNEY Appearance for Plaintiff Yazan Hussein by Alicia Elaine Hwang (Hwang, Alicia) (Entered: 08/06/2014) |
| 08/29/2014 | 8 | ATTORNEY Appearance for Defendants Coinabul, LLC, Jason Shore by Joseph R. Marconi (Marconi, Joseph) (Entered: 08/29/2014) |
| 08/29/2014 | 9 | ATTORNEY Appearance for Defendants Coinabul, LLC, Jason Shore by Ann Elizabeth Zipfel (Zipfel, Ann) (Entered: 08/29/2014) |
| 08/29/2014 | 10 | ATTORNEY Appearance for Defendants Coinabul, LLC, Jason Shore by Frank P. Nowicki (Nowicki, Frank) (Entered: 08/29/2014) |
| 08/29/2014 | 11 | MOTION by Defendants Coinabul, LLC, Jason Shore for extension of time to file answer regarding complaint 1 *DEFENDANTS' MOTION FOR EXTENSION OF TIME TO ANSWER OR OTHERWISE PLEAD TO PLAINTIFF'S COMPLAINT* (Zipfel, Ann) (Entered: 08/29/2014) |
| 08/29/2014 | 12 | NOTICE of Motion by Ann Elizabeth Zipfel for presentment of motion for extension of time to file answer, motion for relief 11 before Honorable James B. Zagel on 9/4/2014 at 09:30 AM. (Zipfel, Ann) (Entered: 08/29/2014) |

| 09/03/2014 | 13 | ENTERED in ERROR (Langs, Brian). Modified on 9/3/2014 (gcy, ). (Entered: 09/03/2014) |
|---|---|---|
| 09/03/2014 | 14 | NOTICE of Correction regarding attorney appearance 13 . (gcy, ) (Entered: 09/03/2014) |
| 09/03/2014 | 15 | ATTORNEY Appearance for Defendants Coinabul, LLC, Jason Shore by Brian C. Langs (Langs, Brian) (Entered: 09/03/2014) |
| 09/03/2014 | 16 | MINUTE entry before the Honorable James B. Zagel: Defendants' Motion for an Extension of Time 11 is granted. Defendants shall answer or otherwise plead on or before 10/3/14. Hearing set for 9/4/14 is stricken and no appearance is necessary. Status hearing set for 10/21/14 at 9:15 a.m. Mailed notice (ep, ) (Entered: 09/03/2014) |
| 09/08/2014 | 17 | SUMMONS Returned Executed by Yazan Hussein as to Jason Shore on 8/9/2014, answer due 9/1/2014. (Hwang, Alicia) (Entered: 09/08/2014) |
| 10/03/2014 | 18 | MOTION by Defendants Jason Shore, Coinabul, LLC to dismiss *pursuant to Fed. R. Civ. P. 12(b)(3)*, MOTION by Defendants Jason Shore, Coinabul, LLC to strike complaint 1 *class allegations* (Attachments: # 1 Exhibit A)(Zipfel, Ann) (Entered: 10/03/2014) |
| 10/03/2014 | 19 | NOTICE of Motion by Ann Elizabeth Zipfel for presentment of motion to dismiss, motion to strike, motion for relief,,, 18 before Honorable James B. Zagel on 10/21/2014 at 09:30 AM. (Zipfel, Ann) (Entered: 10/03/2014) |
| 10/21/2014 | 20 | MINUTE entry before the Honorable James B. Zagel: Motion hearing held. Defendants' Jason Shore, Coinabul, LLC Motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(3) 18 is entered and continued. Plaintiff's Response due 11/4/2014. Defendants' Reply due 11/18/2014. Status/Ruling hearing set for 12/16/2014 at 9:15 a.m. Mailed notice. (nf, ) (Entered: 10/22/2014) |
| 11/04/2014 | 21 | MOTION by Plaintiff Yazan Hussein for extension of time to file response/reply as to motion to dismiss, motion to strike, motion for relief,,, 18 *[Unopposed Motion to Extend Briefing Schedule on Defendants' Motion to Dismiss]* (Thomassen, Benjamin) (Entered: 11/04/2014) |
| 11/04/2014 | 22 | MINUTE entry before the Honorable James B. Zagel: Plaintiff's Unopposed Motion to Extend Briefing Schedule on Defendants' Motion to Dismiss 21 is granted. Plaintiff's Response due by 11/11/2014, Defendants' Replies due by 11/25/2014. Mailed notice. (nf, ) (Entered: 11/04/2014) |
| 11/11/2014 | 23 | RESPONSE by Yazan Husseinin Opposition to MOTION by Defendants Jason Shore, Coinabul, LLC to dismiss *pursuant to Fed. R. Civ. P. 12(b)(3)*MOTION by Defendants Jason Shore, Coinabul, LLC to strike complaint 1 *class allegations* 18 (Attachments: # 1 Exhibit 1 - Balabanian Decl., # 2 Exhibit 2 - Hussein Decl.)(Balabanian, Rafey) (Entered: 11/11/2014) |
| 11/25/2014 | 24 | REPLY by Defendants Coinabul, LLC, Jason Shore to motion to dismiss,, motion to strike,, motion for relief, 18 *(attachment filed separately)* (Zipfel, Ann) (Entered: 11/25/2014) |
| 11/25/2014 | 25 | DECLARATION of Jason Shore regarding reply 24 (Zipfel, Ann) (Entered: 11/26/2014) |
| 11/26/2014 | 26 | Attachment to Declaration (Dkt # 25 ) by Coinabul, LLC, Jason Shore (Zipfel, Ann) Docket Text Modified by Clerk's Office on 11/26/2014 (ph, ). (RESTRICTED) (Entered: 11/26/2014) |
| 12/02/2014 | 27 | MOTION by Defendants Coinabul, LLC, Jason Shore to seal document other 26 (Zipfel, Ann) (Entered: 12/02/2014) |
| 12/02/2014 | 28 | NOTICE of Motion by Ann Elizabeth Zipfel for presentment of motion to seal document, motion for relief 27 before Honorable James B. Zagel on 12/9/2014 at 09:30 AM. (Zipfel, Ann) (Entered: 12/02/2014) |
| 12/08/2014 | 29 | MINUTE entry before the Honorable James B. Zagel: The defendants' agreed motion to motion to place document Motion to seal document 27 is granted. The Clerk's Office shall place document 26 under seal. No appearance is required on 12/9/2014. Mailed notice (cdh, ) (Entered: 12/08/2014) |

| 12/12/2014 | 30 | MINUTE entry before the Honorable James B. Zagel: The hearing set for 12/16/2014 is canceled and reset to 1/28/2015 at 9:30 a.m. No appearance is required on 12/16/2014. Mailed notice (cdh, ) (Entered: 12/12/2014) |
|---|---|---|
| 12/19/2014 | 31 | MEMORANDUM OPINION AND ORDER Signed by the Honorable James B. Zagel on 12/19/2014. Defendants' motion to dismiss and motion to strike the class action allegations are both denied. Mailed notice(cdh, ) (Entered: 12/19/2014) |
| 01/13/2015 | 32 | ANSWER to Complaint with Jury Demand by Coinabul, LLC, Jason Shore(Zipfel, Ann) (Entered: 01/13/2015) |
| 01/28/2015 | 33 | MINUTE entry before the Honorable James B. Zagel:Status hearing held on 1/28/2015 and continued to 4/28/2015 at 09:15 AM.Mailed notice (kef, ) (Entered: 01/28/2015) |
| 02/02/2015 | 34 | MOTION by counsel for Defendants Coinabul, LLC, Jason Shore to withdraw as attorney *for the Defendants without Substitution* (Zipfel, Ann) (Entered: 02/02/2015) |
| 02/02/2015 | 35 | NOTICE of Motion by Ann Elizabeth Zipfel for presentment of motion to withdraw as attorney 34 before Honorable James B. Zagel on 2/24/2015 at 09:30 AM. (Zipfel, Ann) (Entered: 02/02/2015) |
| 02/03/2015 | 36 | *Amended* NOTICE of Motion by Ann Elizabeth Zipfel for presentment of motion to withdraw as attorney 34 before Honorable James B. Zagel on 2/24/2015 at 09:30 AM. (Zipfel, Ann) (Entered: 02/03/2015) |
| 02/24/2015 | 37 | MINUTE entry before the Honorable James B. Zagel: Defendants' Motion to Withdraw Counsel of Record without Substitution 34 is granted. Defendants' counsel are granted leave to withdraw no earlier than 3/3/15. Status hearing set for 4/28/15 is stricken and reset to 4/7/15 at 9:15 a.m. Mailed notice (ep, ) (Entered: 02/24/2015) |
| 04/07/2015 | 38 | MINUTE entry before the Honorable James B. Zagel: Status hearing held and continued to 5/6/15 at 9:15 a.m. Failure of Defendant to appear at the next status hearing may result in default judgment. Mailed notice (ep, ) (Entered: 04/07/2015) |
| 05/06/2015 | 39 | MINUTE entry before the Honorable James B. Zagel: Status hearing held. Defendant failed to appear. In accordance with the Court's Order issued on 4/7/15 38 , default is entered. Prove-up hearing set for 6/4/15 at 9:30 a.m. Mailed notice (ep, ) (Entered: 05/07/2015) |
| 06/01/2015 | 40 | MINUTE entry before the Honorable James B. Zagel: Prove-up hearing set for 6/4/15 is stricken and reset to 6/18/15 at 9:30 a.m. Mailed notice (ep, ) (Entered: 06/01/2015) |
| 06/17/2015 | 41 | DECLARATION of Yazan Hussein *in Support of Damages Prove-Up* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Scharg, Ari) (Entered: 06/17/2015) |
| 06/18/2015 | 42 | MINUTE entry before the Honorable James B. Zagel: Prove-up hearing held. Pursuant to Plaintiff's Declaration in Support of Damages 41 , default judgment is entered in favor of Plaintiff and against Defendants in the amount of $1,557,247.82 in damages and $816.00 in costs. Counsel may submit a judgment order to the Court's proposed orders inbox. All pending motions are moot. Civil case terminated. Mailed notice (ep, ) (Entered: 06/19/2015) |
| 07/06/2015 | 43 | ORDER of Default Judgment. Signed by the Honorable James B. Zagel on 7/6/2015.(lcw, ) (Entered: 07/06/2015) |

**PACER Service Center**

**Transaction Receipt**

05/03/2016 16:47:57

# Exhibit C

Jason Shore and Coinabul, LLC v. Johnson & Bell, Ltd.
USDC for the Northern District of Illinois Case No. 16CV4363
Defendant's Response to Plaintiffs' Motion to Unseal Case

IN THE UNITED STATE 1:16-cv-04363
FOR THE NORTHERN DISTRICT O<sup></sup> Judge Milton I. Shadur
Magistrate Judge Susan E. Cox

JASON SHORE and COINABUL, LLC,          Cas
individually and on behalf of all others
similarly situated,

          Plaintiffs,          **DOCUMENT FILED PROVISIONALLY
                       UNDER SEAL**

       v.

JOHNSON & BELL, LTD, an Illinois
corporation,

          Defendant.

**RECEIVED**

APR 1 5 2016

**THOMAS G BRUTON
CLERK, U S DISTRICT COURT**

## PLAINTIFFS' MOTION TO TEMPORARILY SEAL

Pursuant to Local Rules 5.7 and 26.2 as well as Fed. R. Civ. P. 5.2(d), Plaintiffs Jason

Shore and Coinabul, LLC ("Plaintiffs") hereby respectfully request that the Court enter an Order

permitting them to temporarily file under seal documents that reveal, reference, or otherwise

discuss (i) sensitive, protected, and confidential client-related information and documents in the

custody and control of Defendant Johnson & Bell, LTD (a major Chicago-based law firm), and

(ii) the specific manner in which Johnson & Bell makes that information and those documents

publicly available (ie, through poorly-secured computer systems). Specifically, Plaintiffs request

that the Court allow this Motion and the following three documents to be filed under seal

pursuant to Local Rules 5.7 and 26.2 as well as Fed. R. Civ. P. 5.2(d):

- Plaintiffs' Class Action Complaint. Plaintiffs' verified complaint details how
  Johnson & Bell's computer systems make confidential client information
  belonging to Plaintiffs and thousands of other clients publicly accessible without
  authorization.

- Plaintiff's Motion for Temporary Restraining Order ("TRO"). Like Plaintiffs'
  Complaint, Plaintiffs' TRO describes how Johnson & Bell's computer systems
  make clients' confidential and sensitive information publicly accessible without
  authorization.

- The Declaration of Plaintiff's Expert Craig J. Snead, of Raw Digital, LLC ("Snead Declaration"), submitted in support of Plaintiff's TRO. The Snead Declaration contains detailed descriptions of Johnson & Bell's computer systems, the confidential and sensitive information they store, and how such information can be accessed without authorization through Johnson & Bell's systems.

Each of these filings reveals, in explicit detail, where and how Johnson & Bell has left its clients' confidential information unsecured and unprotected. The information that Plaintiffs seek to file under seal essentially provides what amounts to a step-by-step outline to anyone—including hackers, cybercriminals, or anyone else with a sense of curiosity—detailing how to access and/or compile exposed confidential client information and exploit the obvious security flaws in Johnson & Bell's computer systems. Were these filings to be made public before the at-issue security flaws are addressed and remedied, Plaintiffs and members of the putative Class would be exposed to a heightened risk of additional injuries—both economic and noneconomic. For example, if these filings are made public, highly valuable (and sensitive) intellectual property belonging to Johnson & Bell's clients will effectively be broadcast worldwide.

Plaintiffs are aware that absent an Order extending or setting aside the sealing, the above-referenced documents and their contents will become public on the seventh day following the date of filing. *See* L.R. 5.7(a)(3). But because of the reasons set forth in this Motion, Plaintiffs believe that special circumstances exist which require that the Court restrict access to this case at filing. *See* L.R. 5.7(a)(2). Plaintiffs therefore request that the Court enter an Order granting Plaintiffs' Motion to Temporarily Seal (1) their Class Action Complaint, (2) their Motion for Temporary Restraining Order, (3) the Snead Declaration, (4) this Motion, and (5) all related papers. Plaintiffs' request that these documents remain under seal until the security flaws in Defendant's computer systems have been adequately addressed and Defendant adequately secures its computer systems. In the alternative, should the Court deny this Motion, Plaintiffs

2

request that the Court grant an *in camera* hearing so that they may be heard on these issues and, at that time, discuss and request alternative relief in order to best protect their and absent Class members' interests should this matter be made public.

## I.    ARGUMENT

The Court should grant Plaintiffs' request to temporarily seal this case. The public's legitimate interest in accessing judicial proceedings is overridden when "there is good cause for sealing a part or the whole of the record." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999); *see also Strait v. Belcan Engineering Grp., Inc.*, No. 11-cv-1306, 2012 WL 2277903, at *2 n.1 (N.D. Ill. June 18, 2012). Here there is more than simple good cause for sealing the case – Plaintiffs and the putative Class are in fact at risk of suffering serious harm if the Court does not grant this motion.

Courts appropriately restrict public access to a case where, as here, certain documents "might . . . become a vehicle for improper purposes." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978). For example, courts in this District have sealed documents that contain "confidential financial information" to prevent the ramifications of that type of sensitive information becoming public. *See F.T.C. v. QT, Inc.*, No. 03-cv-3578, 2005 WL 2240874, at *5 n.21 (N.D. Ill. Sept. 14, 2005); *see also Cavin v. Home Loan Ctr. Inc.*, 469 F. Supp. 2d 561, 564 n.3 (N.D. Ill. 2007) (acknowledging that "detailed information about Plaintiffs' credit histories" were permitted to be filed under seal). Moreover, documents should be filed under seal where disclosure of the documents "could lead to a breach in the security of a [computer] system." *In re Google Inc. Gmail Litig.*, No. 13-md-02430, 2013 WL 5366963, at *3 (N.D. Cal. Sept. 25, 2013). In these circumstances, sealing documents is necessary to prevent "hackers and spammers" with nefarious intentions from unlawfully accessing confidential information. *Id.*

3

Another interest which often overrides the public interest in access to court documents is the "privacy interests of the litigants." *Citizens First Nat'l*, 178 F.3d at 945. So "[a]lthough documents submitted to a court are presumptively available for public inspection in order to facilitate public monitoring of the courts, portions of documents that are shown to contain trade secrets, or other information that would cause undue private or public harm if disclosed, as by invading personal privacy gratuitously, may be kept under seal." *SmithKline Beecham Corp. v. Pentech Pharmaceuticals, Inc.*, 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003) (internal citations omitted). Here, the privacy interests of Plaintiffs as well as those of the putative Class hang in the balance on this motion.

Plaintiffs' Complaint, TRO, and the Snead Declaration all contain detailed allegations and facts regarding Johnson & Bell's computer systems, which maintain clients' confidential and sensitive information. The Complaint's allegations (and the references to those allegations in the TRO and Snead Declaration) detail (i) how employees interact with Johnson & Bell's computer systems and databases through Johnson & Bell's website, time-tracking system, virtual private network, and email system, (ii) how Johnson & Bell's systems verify and authenticate users before providing them with access to the confidential client information stored on its servers, and (iii) how Johnson & Bell's verification and authentication process lacks basic industry-standard protections—essentially allowing anyone, authorized or not, to access confidential records and client information stored by Johnson & Bell. The Snead Declaration, in turn, forensically describes and confirms allegations in the Complaint regarding Johnson & Bell's computer systems and publicly available websites.

Plaintiffs seek to file these materials under seal because their release would almost certainly lead to further unauthorized disclosure of Plaintiffs' and the putative Class's sensitive

and private client information. Johnson & Bell is a major Chicago law firm, employing nearly 100 attorneys, and the nature of this lawsuit is sure to draw attention from the media. Given this potential exposure, there is a high likelihood that the methods and practices detailed in the Complaint, TRO, and Snead Declaration would draw further attention to the at-issue confidential client information (which is already vulnerable and exposed to the public). Worse, the forensic details contained in the documents would provide malicious users with a blueprint to compile hundreds of thousands of records of confidential client information belonging to Plaintiffs and the putative Class, alerting them to Defendant's unsecured computer systems and their lack of basic safeguards against unauthorized access.

Plaintiffs and the putative Class have already been harmed by Johnson & Bell's practices of making their confidential client information publicly accessible through its websites. They would face further harm if hackers and criminals were directly alerted to Defendant's insecure computer systems. *See Purdy v. Burlington Northern and Santa Fe Railway Co.*, No. 98-cv-833, 2000 WL 34251818, at *4 (D. Minn. Mar. 28, 2000) (stating that the *threat* of the disclosure of private information constituted irreparable harm). Because the disclosure of the above-described information "could lead to a breach in the security of [Johnson & Bell's computer] system" and the further unauthorized disclosure of Plaintiffs' and the Class's confidential client information, the Court should grant Plaintiffs' Motion to Seal. *See In re Google*, 2013 WL 5366963, at *3. Indeed, making Plaintiffs' allegations and related material publicly available would let "hackers and spammers"—along with anyone else who cared to do so—"use [the] information" for malicious purposes. *Id.*

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an Order granting Plaintiffs' Motion to Temporarily Seal until these issues have been addressed through the

5

Temporary Restraining Order and Preliminary Injunction proceedings and Defendant secures its

computer systems, or until further order of the Court.

Respectfully Submitted,

**JASON SHORE** AND **COINABUL, LLC,**
individually and on behalf of all others similarly
situated,

Dated: April 15, 2016

By: _____

One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin Richman
brichman@edelson.com
Benjamin Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

Todd Logan*
EDELSON PC
329 Bryant Street
San Francisco, California 94107
Tel: 415.234.5260
Fax: 415.373.9495

* *Pro Hac Vice* admission pending.

6

## CERTIFICATE OF SERVICE

I, Jay Edelson, an attorney, certify that on April 15, 2016, I will serve the above and foregoing *Plaintiffs' Motion to Temporarily Seal*, by causing true and accurate copies of such paper to be hand-delivered to the registered agent of Defendant, Johnson & Bell, LTD, on this 15th day of April 2016.

7

# Exhibit D

Jason Shore and Coinabul, LLC v. Johnson & Bell, Ltd.
USDC for the Northern District of Illinois Case No. 16CV4363
Defendant's Response to Plaintiffs' Motion to Unseal Case



# WILLIAMS MONTGOMERY & JOHN LTD

## A FIRM OF TRIAL LAWYERS

**Michael C. Bruck**
Direct: 312-443-3235
Fax: 312-6308535
mcb@willmont.com

May 9, 2016

<u>**Via Email and Hand Delivery**</u>

Jay Edelson
jedelson@edelson.com
Edelson PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654

       Re:    *Jason Shore and Coinabul, LLC v. Johnson & Bell*
               USDC ILND: 2016-CV-04363

Dear Jay:

    I am writing pursuant to Rule 11(b) and (c) of the Federal Rules of Civil Procedure to request that you dismiss the above-referenced action against my client Johnson & Bell, Ltd. ("J&B").

    Rule 11(b) provides, in relevant part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
>     (1)  it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
>     (2)  the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
>     (3)  the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable

May 9, 2016
Page 2

opportunity for further investigation or discovery. . .

Fed. R. Civ. P. 11(b).

Failure to comply with the requirements of Rule 11 can lead to the imposition of sanctions against the offending attorney, including the payment of opposing party's attorneys' fees. Fed. R. Civ. P. 11(c). One of the basic purposes of Rule 11 is "to deter baseless filings in the district court." *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998). Indeed, "the very point of Rule 11 is to lend incentive for litigants to stop, think and investigate more carefully before serving papers and filing papers." *Berwick Grain Co., Inc. v. Illinois Dept. of Agriculture*, 217 F.3d 502, 504 (7th Cir. 2000) (internal citations omitted). Sanctions under Rule 11 may be imposed on a party "for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose." *Id.*; *see also U.S. Bank Nat. Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465, 469-470 (7th Cir. 2005) (finding a violation of Rule 11 where law firm moved forward with eviction after learning of incorrect address in its pleadings).

When considering a Rule 11 motion for sanctions, the court "employs a standard of objective reasonableness, and must consider whether a reasonable attorney would have or should have known that his conduct violated the provisions of the Rule." *Optionsxpress, Inc. v. Hale*, 2009 WL 4015556, Case No. 08 C 179, at *1 (N.D. Ill. Nov. 19, 2009). "Subjective good faith is no longer a valid defense to charges of having transgressed Rule 11's proscriptions." *Diversified Technologies Corp.*, 118 F.R.D. 445, 450 (N.D. Ill. 1988). Indeed, "[p]ure heart, empty head" is not a defense. *Id.* "The Court must look to the circumstances surrounding the allegedly sanctionable conduct, and may impose sanctions even if only some of the party's actions violated the Rule." *Optionsxpress, Inc. v. Hale*, 2009 WL 4015556, Case No. 08 C 179, at *1 (N.D. Ill. Nov. 19, 2009).

In the present case, Plaintiffs' Complaint fails to satisfy the objective reasonableness standards of Rule 11. First, Plaintiffs' claim against J&B is not objectively reasonable because there is no evidentiary basis to allege J&B's Webtime server to access billing records "is built on a 'JBoss Application Server' ...." (Complaint at ¶ 20.) Second, Plaintiffs' claim against J&B is not objectively reasonable because no unauthorized access has been alleged and, thus, standing is lacking and/or the claims are moot.

## Lack of Evidentiary Support to Claim Use of Out of Date JBoss Application Server

Plaintiffs' complaint is founded on a central allegation that J&B's Webtime server for access to its billing software "is built on a 'JBoss Application Server'...." (Complaint at ¶ 20.) We have asked on several occasions for the basis of this claim and none has been supplied.

Plaintiffs claim, among other things, that the Webtime server allows staff and attorneys to track their time on a system that is accessible from the internet. (Complaint at ¶ 18.) They further allege that hackers can gain access to the system "with impunity because Defendant has improperly configured the service and left it running out-of-date software." (Complaint at ¶ 19.)

May 9, 2016
Page 3

The complaint claims "Defendant's Webtime time tracking system is built on a "JBoss Application Server"...that is allegedly "woefully out-of-date and suffers from critical vulnerability." (Complaint at ¶¶ 20, 21.) The complaint goes on to claim that J&B's "time record system can be accessed without any username or password and that certain specified information can, therefore, be accessed and certain allegedly "devastating" results could potentially occur. (Complaint at ¶¶ 36-41.)

As mentioned, we have asked you on several occasions the basis for the claim that J&B is running a JBoss Application Server, and that basis has not been provided by Plaintiffs. A specific reason for the request is because, prior to the filing of this suit, as a matter of fact, J&B was not running on a JBoss Application Server for its Webtime time and billing system and, thus, the central factual allegation of the suit is baseless.

Accordingly, because the central factual allegation of Plaintiffs' complaint lacks any evidentiary support, pursuant to Rule 11, we demand the suit be withdrawn.

### Failure to State a Viable Claim against Johnson & Bell

Moreover, Plaintiffs' complaint fails to state a viable claim against J&B. Not only is the central factual claim of using a JBoss Application Server baseless, Plaintiffs' complaint fails to allege a breach or "hack" of the server.

First, Plaintiffs cannot establish standing to bring this action as Plaintiffs have not suffered an injury. Standing under Article III of the United States Constitution requires plaintiffs to demonstrate that they have "suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Lewert v. P.F. Chang's China Bistro, Inc.*, No. 14-3700, 2016 WL 1459226, at *2 (7th Cir. Apr. 14, 2016) (quoting *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661, 186 L. Ed. 2d 768 (2013)). Plaintiffs are unable to demonstrate a "concrete and particularized injury" because there isn't one. J&B's servers were never breached and, thus, Plaintiffs have suffered no injury.

Second, Plaintiffs cannot establish standing under Article III because they are not threatened with certainly impending future harm. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1151 (2013). As demonstrated above, the central basis for the claim of inadequate cybersecurity is baseless and there has been no server breach. Plaintiffs' allegations of a possible future breach are thus, at best, speculative and remote and Plaintiffs cannot show a risk of certainly impending future harm.

Third, Plaintiffs' claim for injunctive relief is moot because the allegedly "inadequate" JBoss Application Server was not in use at the time of this suit and, thus, there is no likely danger of Plaintiffs' information being hacked. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 375 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary

May 9, 2016
Page 4

relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."); *Wernsing v. Thompson*, 423 F.3d 732, 744 (7th Cir. 2005) ("The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.") (citation omitted)).

Fourth, because Johnson & Bell's servers are up-to-date, Plaintiffs' additional claims seeking an order requiring Defendant to inform its clients that its computer systems are not secure and allow a third-party firm to perform a security audit are also moot.

Fifth, given the mootness of Plaintiffs' injunctive relief claim, Plaintiffs' claim for declaratory judgment alone does not present a live case or controversy under Article III, rendering the claim moot. *See e.g.*, *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) (finding prisoner's declaratory and injunctive actions moot when after being transferred without explanation from a medium to a maximum security facility, prisoner was returned to a medium security prison before the district court could rule and no adverse action had been taken against the prisoner as a result of the transfer); *Cornucopia Inst. v. U.S. Dep't of Agric.*, 560 F.3d 673, 676 (7th Cir. 2009) ("The Declaratory Judgment Act did not (and could not) alter the constitutional definition of "case or controversy" or relax Article III's command that an actual case or controversy exist before federal courts may adjudicate a question."). Thus, Plaintiffs' declaratory judgment claim is moot.

Accordingly, in accordance with Rule 11, we request that Plaintiffs' complaint be withdrawn in its entirety. All rights are reserved and none are waived.

Very truly yours,

Michael C. Bruck

MCB
#1239305

# Exhibit E

Jason Shore and Coinabul, LLC v. Johnson & Bell, Ltd.
USDC for the Northern District of Illinois Case No. 16CV4363
Defendant's Response to Plaintiffs' Motion to Unseal Case



**Portfolio Media. Inc.** | 860 Broadway, 6th Floor | New York, NY 10003 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# BigLaw In Crosshairs As Firm Plans Data Breach Litigation

By **Aebra Coe**

Law360, New York (March 31, 2016, 12:35 PM ET) -- Following reports that Cravath Swaine & Moore LLP and Weil Gotshal & Manges LLP suffered data breaches at the hands of hackers, a plaintiffs law firm said Thursday that it plans to bring class action legal malpractice litigation against legal industry players over the exposure of client information.

Law firms have a professional duty to protect the privacy of client information, but most of them are not doing a good job when it comes to protecting that information from hackers, according to Jay Edelson, founder and CEO of privacy class action law firm Edelson PC, which nearly a year ago began investigating class action litigation against as-of-yet unnamed law firms over client data breaches.

Edelson says that his team of forensic engineers and lawyers with technology and privacy expertise have attacked the topic of hacking through an internal lab at the law firm, where scientists and attorneys are encouraged to identify vulnerabilities in the business world. He says that it was that process that led the firm to conclude that the health care industry and the legal industry are the two most attractive targets for hackers.

"We told law firms that we think they are one of the biggest targets out there. They have, often, the most sensitive client information, and they have, in a lot of ways, incredibly insecure systems," Edelson said. "Our view was that hackers were going to be targeting them in a systematic way and that they had to get a lot smarter on that. But they haven't."

The computer networks of Cravath, Weil and other major law firms were **penetrated by unknown hackers** possibly looking to profit from confidential or insider information for publicly traded companies, according to a Tuesday news report.

The FBI and federal prosecutors with the Southern District of New York have opened an investigation to determine if any confidential information was stolen by hackers and used for insider trading, according to The Wall Street Journal, which cited anonymous sources. The report said other prominent firms had their networks breached and that hackers are threatening further attacks.

Cybersecurity firm Flashpoint reportedly issued an advisory alert in February that nearly 50 prestigious law firms — including Sidley Austin LLP, Kirkland & Ellis and Jenner & Block — were targeted by foreign hackers looking for insider information, according to Crain's Chicago Business.

Edelson said that he believes litigation provides a "road map to hackers," who are able to search dockets and identify redacted information that they think could be useful or

valuable, then find out which law firms are involved and target those law firms to obtain the information.

He said the biggest law firms have put a series of top-level security measures in place, but the vulnerability lies in compliance among all attorneys at a firm.

"Firms are incapable of getting the 60-year-old rainmaking partner to not use public Wi-Fi or access client documents on a computer that is not secure," he said. "They are just totally dropping the ball there."

The planned class action litigation will involve claims for breach of contract and legal malpractice, Edelson said.

"There's no question the firms have a legal duty to take reasonable protections to protect data, and if they're not doing that they're breaching their standard of care," he asserted.

He added that, according to the firm's research, he believes that many law firms targeted by hackers do not inform clients about resulting data breaches in a timely manner.

"We've heard story after story from our friends on the defense side — it's a worst-kept secret that there are data breaches all the time at law firms, and there are a ton of state laws which require notification of data breaches, and the law firms seem to not care about those laws," Edelson said.

He said that as his firm plans a class action, he anticipates state attorneys general and even the Federal Trade Commission may be investigating, or begin to probe in the near future, law firm cybersecurity reporting practices.

--Additional reporting by Y. Peter Kang. Editing by Jeremy Barker.

All Content © 2003-2016, Portfolio Media, Inc.

# Exhibit F

Jason Shore and Coinabul, LLC v. Johnson & Bell, Ltd.
USDC for the Northern District of Illinois Case No. 16CV4363
Defendant's Response to Plaintiffs' Motion to Unseal Case

- Law360's MVPs
- Glass Ceiling Report
- Global 20
- Law360 400
- Minority Report
- Practice Group Partner Rankings
- Practice Groups of the Year
- Pro Bono Firms of the Year
- Rising Stars
- Trial Aces
- Site Menu
- Join the Law360 team
- Search legal jobs
- Learn more about Law360
- Read testimonials
- Contact Law360
- Sign up for our newsletters
- Site Map
- Help

# Edelson Targets Chicago Law Firm Over Lax Data Security

Share us on: By **Allison Grande**

Law360, New York (May 5, 2016, 3:50 PM ET) -- Plaintiffs firm Edelson PC is moving to lift the veil on a putative privacy class action that it recently filed against a Chicago-based regional law firm that it accuses of failing to maintain robust data security practices to effectively safeguard sensitive client data, founder Jay Edelson said Thursday.

The plaintiffs class action heavyweight revealed in late March that **it was gearing up** to bring malpractice class actions against legal industry players over the exposure of client information, following the firm's extensive investigation into data security being employed at law firms. The firm publicly followed up on the promise Thursday, confirming that it had already lodged at least one such action under seal and that it was in the process of removing the case from the shadows.

"Moving to unseal #datasecurity #privacy #classaction complaint against Chicago law firm," Jay Edelson, the founder and CEO of the firm, wrote on Twitter Thursday morning. "If granted, all pleadings will be public. #roadmap"

In an email to Law360 on Thursday, Edelson elaborated on his tweet, explaining that the suit was being filed on behalf of current and past clients of a "regional law firm based in Chicago," which has been "an outspoken voice on the need for law firms to improve security practices."

"[The regional firm] has even acknowledged that failing to secure client data could be malpractice," Edelson added.

The complaint alleges that the unidentified law firm suffered from a "number of significant data security vulnerabilities," which resulted in "anyone with nefarious intent" — even if they were not a sophisticated hacker — likely being able to gain access to a "whole host of sensitive client data," including the law firm's line-item billing records and possibly email contents, according to Edelson.

Through the case, the plaintiffs firm and its clients are seeking injunctive relief and damages, based on the theory that the unidentified regional law firm's clients "have been overpaying for legal services (because they have been paying, in part, to keep their data secure — and the law firm hasn't been keeping up with their end of the bargain)," Edelson said.

Edelson added that his firm elected to file the case under seal in order to not alert nefarious actors to the specific vulnerabilities at the law firm prior to the problems being fixed, but now that the alleged shortcomings appear to be remedied, the plaintiffs' firm is planning to file its motion to unseal shortly.

The timetable for the court to decide the firm's request is uncertain, according to Edelson, given that the firm expects that the John Doe law firm will oppose its bid to bring the case into the public eye.

"Assuming that happens, we do not know when it will be ruled upon — likely after briefing," Edelson said.

The announcement last month by the plaintiffs firm — which is also based in Chicago and recently **opened its first outpost** in San Francisco — that it was planning to go after other law firms over their data security practices came on the heels of reports that firms including Cravath Swaine & Moore LLP and Weil Gotshal & Manges LLP had **suffered data breaches** by unknown hackers possibly looking to profit from confidential or insider information for publicly traded companies.

The FBI and federal prosecutors with the Southern District of New York have opened an investigation to determine if any confidential information was stolen by hackers and used for insider trading, according to a Wall Street Journal report, which cited anonymous sources and was made public just two days before Edelson announced its planned litigation blitz. The report said other prominent firms had their networks breached and that hackers are threatening further attacks.

Cybersecurity firm Flashpoint reportedly issued an advisory alert in February that nearly 50 prestigious law firms — including Sidley Austin LLP, Kirkland & Ellis LLP and Jenner & Block LLP — were targeted by foreign hackers looking for insider information, according to Crain's Chicago Business.

Edelson said in March that he believes litigation provides a "road map to hackers" who are able to search dockets and identify redacted information that they think could be useful or valuable, then find out which law firms are involved and target those law firms to obtain the information.

He added that law firms have a professional duty to protect the privacy of client information, but most of them are not doing a good job when it comes to protecting that information from hackers.

While the biggest law firms have put a series of top-level security measures in place, the vulnerability lies in compliance among all attorneys at a firm, especially older partners who may not fully grasp the insecurity of behavior such as using public networks to access client documents, according to Edelson.

The plaintiffs firm began its investigation nearly a year ago into the security of law firm networks, with a team of forensic engineers and lawyers attacking the topic of hacking through an internal lab at the law firm. At the lab, scientists and attorneys are encouraged to identify vulnerabilities in the business world, a process that led the firm to conclude that the health care industry and the legal industry are the two most attractive targets for hackers, according to Edelson.

According to the firm's research, he believes that many law firms targeted by hackers do not inform clients about resulting data breaches in a timely manner. He added that he wouldn't be surprised if state attorneys general and even the Federal Trade Commission soon jump into the fray and become interested in probing the topic of law firm cybersecurity reporting practices.

Case and counsel information for the data security case revealed Thursday was not immediately available.

--Additional reporting by Aebra Coe. Editing by Christine Chun.

## Related Articles

- BigLaw In Crosshairs As Firm Plans Data Breach Litigation
- Target Says Unsealing Breach Docs Invites Another Attack
- Cravath, Weil, Other BigLaw Firms Hacked
- Cybersecurity Big For Hospitality Cos. Now More Than Ever

View comments

Enter First and Last Name  Your name will appear next to your comment. If you do not disclose your full name, your comment will be deleted. Your email address will not be visible to the public.

Terms of Service

Tell us what you think (1,500 characters max)

Comment

- Add to Briefcase
- Printable Version
- Rights/Reprints
- Editorial Contacts

## Related

### Sections

- Legal Industry

# Exhibit G

Jason Shore and Coinabul, LLC v. Johnson & Bell, Ltd.
USDC for the Northern District of Illinois Case No. 16CV4363
Defendant's Response to Plaintiffs' Motion to Unseal Case

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JASON SHORE and COINABUL, LLC, individually and on behalf of all others similarly situated, | Case No.: 16-cv-04363 |
| | DOCUMENT FILED UNDER SEAL |
| *Plaintiffs,* | Hon. John W. Darrah |
| | Magistrate Judge Susan E. Cox |
| v. | |
| JOHNSON & BELL, LTD, an Illinois corporation, | |
| *Defendant.* | |

### NOTICE OF VOLUNTARY DISMISSAL AND OF
### INTENT TO PURSUE REQUESTED UNSEALING OF CASE FILE

**PLEASE TAKE NOTICE** that Plaintiffs Jason Shore and Coinabul, LLC ("Plaintiffs"),

pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), hereby voluntarily dismiss their

individual claims and those of the putative class they seek to represent *without prejudice*. Federal

Rule of Civil Procedure 41(a) provides, in relevant part, that "the plaintiff may dismiss an action

without a court order by filing: (i) a notice of dismissal before the opposing party serves either an

answer or a motion for summary judgment…." Fed. R. Civ. P. 41(a)(1)(A)(i). Accordingly, all

claims in this matter may be dismissed *without prejudice* and without an Order of the Court.

Notwithstanding the above dismissal, Plaintiffs wish to inform the Court that they will

continue to pursue the relief requested in their May 5, 2016 Motion to Unseal Case(the

"Motion"), and respectfully request that the presentment of the Motion remain on calendar as

previously scheduled. (*See* dkt. 3 (continuing presentment of Motion to June 9, 2016 at 9:30

a.m.).) If granted, the Motion would result in the unsealing of the case file in this matter and all

the documents contained therein—namely Plaintiffs' complaint, the motion for temporary

restraining order filed contemporaneously therewith and all orders entered by the courts presiding over the case. Because the public's (along with Plaintiffs' and each putative class member's) right to access the pleadings, orders and other filings in this matter is unaffected by the instant notice of voluntary dismissal, *see, e.g., United States, ex rel. Thomas Durham v. Prospect Waterproofing, Inc.*, 818 F. Supp.2d 64, 67 (D. D.C. Oct. 4, 2011) (unsealing case documents following plaintiff's voluntary dismissal), Plaintiffs may continue to pursue the Motion and hereby give notice of their intent to do so. *See Matter of Cont'l Illinois Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) ("The public's right to access to judicial records has been characterized as 'fundamental to a democratic state,'" a presumption that "is of constitutional magnitude.") (citing collected cases).

Respectfully submitted,

**JASON SHORE** and **COINABUL, LLC,**
individually and on behalf of all others similarly situated,

Dated: May 26, 2016                    By: _____
                                            One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin Richman
brichman@edelson.com
Benjamin Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

Todd Logan (admitted *pro hac vice*)
EDELSON PC
329 Bryant Street
San Francisco, California 94107

2

Tel: 415.234.5260
Fax: 415.373.9495
Firm ID: 44146

3

## CERTIFICATE OF SERVICE

I, Benjamin S. Thomassen, an attorney, hereby certify that on May 26, 2016, I will serve

the above and foregoing document by causing true and accurate copies of such paper to be

transmitted to the persons shown below by electronic mail.

Michael C. Bruck
*mcb@willmont.com*
Willis Tower
233 S. Wacker, Suite 6100
Chicago, Illinois 60606-6359
WILLIAMS, MONTGOMERY, & JOHN LTD

4